# ERWIN DAVIS *v.* BRIDGET DAVIS.

THREE HUNDRED AND NINETY-THIRD SECTION OF PRACTICE ACT.—The word "representative," used in the three hundred and ninety-third section of the Practice Act, as amended in 1863, applies to the executor or administrator of the estate of a deceased person, and also to the person or party who has succeeded to the right of the deceased, whether by purchase, or descent, or operation of law.

A PARTY TO AN ACTION A WITNESS IN HIS OWN BEHALF.—One of the parties in an action to recover possession of land, cannot make himself a witness in his own behalf, on the trial of the same, for the purpose of defeating the title of the adverse party to the land in dispute, if the adverse party is the grantee of a person no longer living, and the facts he offers himself to prove transpired before the death of the grantor of the adverse party.

EQUITABLE ESTOPPELS *In Pais.*— The party relying upon an equitable estoppel *in pais* in an action at law, must inform the adverse party of the nature of the cause of action or defense which he will be obliged to meet, and to do this he must plead it with the same fulness and particularity as is required in cases involving like subjects of inquiry in suits in equity.

WAIVER OF DEFECTIVE PLEADING OF ESTOPPEL *In Pais.*—Where an equitable estoppel *in pais* is not properly pleaded, but on the trial evidence is introduced without objection, in the same manner as if it had been properly pleaded, and a verdict is rendered upon the evidence, without objection, the objection to the pleading will be deemed waived, and the case will be considered as though the estoppel had been properly pleaded.

WHAT WILL CONSTITUTE AN ESTOPPEL *In Pais.*—Whenever an act is done or statement made by a party which cannot be contravened or contradicted by him without fraud on his part and injury to others, whose conduct, without fault on their part, has been influenced by the act done or statement made, the character of estoppel will attach to what would otherwise be mere matter of evidence.

WHAT FACTS NECESSARY TO CONSTITUTE AN ESTOPPEL *In Pais.*—In order to constitute an equitable estoppel with respect to the title of property, it must appear that the party to be estopped has made admissions or declarations, or done acts with the intention of deceiving the other party with regard to the title, or with such carelessness or culpable negligence as to amount to a constructive fraud, and

that at the time of making the admissions or declarations, or doing the act, he was apprised of the true state of his own title, and that the other party was not only destitute of all knowledge of the true state of the title, but also of all convenient or ready means of acquiring such knowledge.

WHAT FACTS DO NOT CONSTITUTE AN ESTOPPEL *In Pais.* — B. was the owner of a lot of land ; C. had it inclosed, and was residing on it, and claimed to own it; D. bargained with C. to purchase it from him, but before making the purchase called on B. and told him she wished to buy the lot of C., and B., in reply, disclaimed having any claim or title thereto. D., relying on this disclaimer, purchased the lot of C., and paid its full value. D., at the time, was not destitute of all knowledge of the true state of the title. B., when he made the disclaimer, was not apprised of the true state of his own title, nor did he intend to deceive or defraud D., nor was he guilty of gross carelessness or culpable negligence ; *Held,* that these facts did not estop B. or his grantee from afterwards setting up title to and recovering possession of the lot from D.

EVIDENCE OF ORAL DECLARATIONS AND ADMISSIONS.—Parol evidence of declarations and admissions of persons made long anterior to the trial, upon which an estoppel *in pais* is sought to be founded, should be carefully scrutinized by Courts and juries, as it is a dangerous species of evidence, and liable to abuse.

INSTRUCTIONS TO JURY.— It is not error for the Court to refuse to instruct a jury " that where two innocent parties must suffer, that party who had been the cause of another's loss must lose."

KNOWLEDGE OF ONE'S OWN TITLE.—The doctrine " that a man claiming to own land " is " bound to know the state of his own title," is not the law in all cases.

STATUTE OF LIMITATIONS — PUEBLO LANDS OF SAN FRANCISCO.—An action may be brought and maintained to recover possession of land within the Pueblo of San Francisco, by one holding title derived from the pueblo at any time within five years after the issuance of a patent for the pueblo lands by the United States.

*Biddle Boggs* v. *Merced Mining Company,* 14 Cal. 367, commented on and explained.

APPEAL from the District Court, Fourth Judicial District, City and County of San Francisco.

The facts are stated in the opinion of the Court.

*Patterson, Wallace & Stow,* for Appellant.

Sections three hundred and ninety-two and three hundred and ninety-three of the Practice Act are copied substantially from the New York Code. Under that statute *McCray* v. *McCray* was decided. (12 Abbott's P. R. p. 1.) That was an action to recover possession of a farm. Defendant claimed the farm by virtue of a parol contract between plaintiff and James G. McCray, deceased, or by a parol gift from the former to the latter.

" The defendant," say the Court, " was not an executrix or

administratrix. She claimed the farm in question by an alleged parol gift of it from the plaintiff to her husband, or under an alleged parol agreement between them. She was guardian in socage of an infant daughter that she had by her deceased husband, and claimed to hold possession of half of the farm as such guardian. She claimed a right to the other half as a mother or heir of her deceased daughter; and also an unadmeasured dower-right in the whole farm as widow of her husband.

" The legal title to the farm was in the plaintiff, and the defendant's defense to the action was an equitable one. She insisted on the trial that she had shown a right, by parol evidence of transactions between the plaintiff and her husband, to a legal title to the farm; which alleged right the plaintiff disproved by his own evidence.

" The defendant defended the action in her own right, and in that of her living infant daughter; not as the representative of her deceased husband, or of her deceased infant daughter. Was her position as defendant, in any sense, that of a representative of a deceased person? I answer, it was not. I am aware that in construing wills, Courts have held the words, ·'representative,' 'legal representative,' and 'personal representative,' may mean next of kin or heirs. But the same Courts have also held that those words in their ordinary sense are to be understood as synonymous with executors and administrators. (2 Lomax on Ex., 2d ed. 58, 59; 2 Jarm. on Wills, 4 Am. ed. 29.) Williams says: ' The ordinary legal sense of the term *representatives*, without the addition of *legal*, or *personal*, is executors or administrators.' (2 Will. on Ex., 5 Am. ed. 1015.)

" The word 'representative' is not defined in Jacob's Law Dictionary; but under the word 'representation' it is therein stated, 'executors represent the person of the testator to receive money and assets.' "

Bouvier says: "A representative of a deceased person, sometimes called a 'personal representative,' or 'legal representative,' is one who is executor or administrator of the person

described." He cites 6 Mad. 159, and 5 Ves. 402. (See 2 Bouv. Law Dict. Tit. Representative.)

" There is no conflict in the old authorities as to the ordinary legal sense of the word 'representative,' and Bouvier's definition of it is adopted in Worcester's Dictionary, which is regarded by many of the most learned men in our country as the best dictionary of the English language now in use.

" Noah Webster, in defining the word 'representative,' says: ' In law, one that stands in place of another as heir, or in the right of succeeding to an estate of inheritance, or to a crown.' (Webster's Dictionary, ed. of 1855.) He gives no authority for his definition, and it should not be adopted against the well understood and long received legal signification of the word.

" I think the natural and most obvious meaning of the words 'representative of a deceased person,' as they are used in section three hundred and ninety-nine of the code, is executors and administrators, and we must hold that they have that meaning. (See *Evans* v. *Charles,* 1 Anst. 128; *Price* v. *Strange,* 6 Mad. 104; Anon. 1 Dyer, 6; 2 Comst. 87; *Bridge* v. *Abbott,* 3 Bro. C. C. 221; 3 Ves. Jr. 48, 146, 184, 186; 5 Ib. 401; 20 Wend. 561, 562; 7 Hill, 408; 1 Kern. 601, 902; Ib. 360.)

" The defendant, therefore, cannot be regarded as a representative of a deceased person within the meaning of section three hundred and ninety-nine of the code."

In *Buckingham* v. *Andrews,* 34 Barb. 434, the plaintiff's action was upon a note payable to himself as *executor,* given after the death of his testator. Defendant offered himself as a witness as to transactions between himself and plaintiff's testator. He was excluded, and the judgment was *reversed on that ground.*

In *Bolton, Adm'r,* v *Smead,* 37 Barb. 141, the three hundred and ninety-ninth section of the New York Code was again construed, and it was *held:* That the administrator was a competent witness on his own behalf, to prove a claim in his own favor against the estate.

Plaintiff was not the representative of Broderick, because the estate of Broderick had no immediate nor remote interest in the result of the action. A recovery by plaintiff could in no manner result to the benefit or prejudice of the *estate*. Plaintiff, as the *remote vendee and grantee* of Broderick, might deny that he acquired any title by the conveyance from Broderick. (*Blight's Lessee* v. *Rochester*, 7 Wheat. 535 ; 18 Cal. 466 ; 1 Comst. 253 ; 11 Barb. 498 ; 6 Id. 111 ; 1 Ala. 292.)

How can plaintiff be said to *represent* Broderick, when he was at liberty to say he got no title from Broderick ?

The plaintiff is as much bound by the estoppel as Broderick would be if *he* were plaintiff. (Washburn on Real Property, Vol. 1, 480, [51] ; *Phelps* v. *Blount*, 2 Dev. 177 ; *Douglas* v. *Scott*, 5 Ohio, 199 ; *Mark* v. *Willard*, 13 N. H. 389.)

The plaintiff had a notice of the estoppel from defendant's actual possession at the time plaintiff took his conveyance from Gallagher. (*Mesick* v. *Sunderland*, 6 Cal. 315 ; *Stafford* v. *Lick*, 7 Cal. 305 ; *Lestrade* v. *Barth*, 19 Cal. 660 ; *Dutton* v. *Warschauer*, 21 Cal. 610.)

The case at bar is exactly parallel with *Storrs & Brooks* v. *Barker*, 6 John. Ch. 166.

The result of the authorities is, that when one has done an act or made a statement to controvert or impair which would amount to a fraud on his part, and such act or statement has so influenced any one that it has been acted upon, the party making it will be estopped and cut off from the power of retraction; and this, whether the party making the statement made it innocently and by mistake, or with intent to deceive, if he knew, at the time of making it, that the other party relied upon it and might be induced to act upon it. In other words, statements and declarations of one's rights to property may amount to a fraud in law though not in morals. (*Den ex dem. Richman et al.* v. *Baldwin*, 1 Zabriskie, 403 ; *Crout* v. *De Wolf*, 1 R. I. 393 ; *Duell* v. *Bear R. & A. M. Co.*, 5 Cal. 85 ; *Mitchell* v. *Reed*, 9 Id. 205 ; *McGee* v. *Stone*, 9 Id. 606 ; *Snodgrass* v. *Ricketts*, 13 Id. 362.)

Broderick disclaimed title directly to defendant, after hav-

ing been apprised by defendant that she intended to purchase of Braddick. Broderick disclaimed having title to the lot—a case much stronger than where the true owner stands by, and by *mere silence* permits another to purchase his property under the belief that he is acquiring the title.

*Hoge & Wilson*, for Respondent.

The question is: What is the proper construction of the three hundred and ninety-third section of our Practice Act, as amended in 1863, and in what sense is the term "representative of a deceased person" used in that section?

The term "legal representative" has not always necessarily the same signification. Its meaning must in every case depend upon the context, the subject matter, and the intention.

As was said by the Supreme Court of Illinois in the case of *Delaney* v. *Burnett*, 4 Gillman, 494, in speaking of this subject: "There is a question of intention to be considered in its construction, and this is not to be gathered solely from the instrument itself, but in part from concomitant circumstances, and the existing state of things, and the relative situation of the parties to be affected by it."

In Bouvier's Law Dictionary, p. 357, the term representative is defined to be "one who represents or is in the place of another."

Webster, in his dictionary, defines it thus: "1st. One that exhibits the likeness of another. 2d. In *legislative* or *other business*, an agent, deputy, or substitute who supplies the place of another or others, being invested with his or their authority. 3d. In *law*, one that stands in the place of another as heir, or in their right of succeeding to an estate of inheritance, *or to a crown*. 4th. That by which anything is exhibited or shown."

In the case of *Montgomery* v. *Landuskey*, 9 Missouri, 714, the Supreme Court of Missouri affirm the principle that a purchaser or grantee may be the "legal representative" of an original claimant.

In the case of *Phelps* v. *Smith*, 15 Illinois, 572, the Supreme Court of Illinois again affirm the doctrine of *Delaney* v. *Burnett*. The case involved the construction of an Act of Congress, granting a right of pre-emption to "each and every person, or his, her, or their legal representative or representatives," etc. In this as in the former case, the Court held that a purchaser from a person entitled to a pre-emption of his interest in the land or right of pre-emption, is as to such land the legal representative of the person entitled to the pre-emption within the meaning of. the Act of Congress, and would take the land directly as grantee by the description of legal representative. The Court go into an examination to ascertain the intention of the law, and on page five hundred and seventy-four, the Judge who delivered the opinion says: " Nothing can be more clear to my mind than that the term ' legal representative,' as used in this law was designed to describe a party in interest whose identity was uncertain, and that by that description it was designed to designate the person or party who had succeeded to the right of the deceased, whether by purchase or descent, or operation of law. It means the party who has the right to and who does legally represent the interest which was once vested in the deceased," etc. (See, also, *Grand Gulf Railroad and Banking Company et al.* v. *Bryan*, 8 Smede & Marshall, 275.)

These authorities, and many others which might be cited, in our judgment .sufficiently establish our position, that the term " legal representative" does not always and necessarily have the same signification. That it is always a matter of construction and intention. The sense in which it is used may be gathered outside of the law itself, from concomitant circumstances and the existing state of things and the relation and situation of the parties to be affected. Keeping these principles in view, let us see if the Court below did not give the sections of our Practice Act upon the subject of the testimony of the parties to a suit their true construction.

It was undoubtedly the policy of the law that both parties should be in a position to testify about the same transac-

tions. The language of the section effectually carries out this policy.

But by the Act of the 27th of April, 1863, the Legislature amended sections three hundred and ninety-one, three hundred and ninety-two, and three hundred and ninety-three of the Practice Act, and then repealed the sections four hundred and eighteen, four hundred and twenty-one, four hundred and twenty-two, and four hundred and twenty-three.

These amendments stripped the law of 1861, which we have just commented upon, of its complicated machinery, but retained its entire substance and policy. Section three hundred and ninety-three now reads : " No person shall be allowed to testify, etc., where the party, etc., is the *representative* of a deceased person, when the facts to be proved transpired before the death of such deceased person."

The terms " assignee, executor, or legal representative," are dropped, and the generic term "representative," which includes them all, is preserved. Nor is the term qualified by the prefix, " legal," or "*personal.*" The object undoubtedly was to preserve the substance of the old law. It is not to be supposed that any change of policy had occurred. The contrary is apparent from the whole language. The object was to simplify the sections regulating these matters, get rid of the limitations and restrictions in the four hundred and twenty-second section, and at the same time to retain its essence. This is attempted to be done by language sufficiently comprehensive to cover all the cases specially named in the former law. That law *ex industria* specified every possible case requiring the application of the principle ; this does the same thing by the use of a term which, manifestly, the Legislature thought effected the same object. We submit that the whole operation of the amendments of 1863, was merely to simplify the law on this subject, and remove the necessity for considering the numerous and perplexing questions which arose upon the construction of the four hundred and twenty-second section as it previously stood, and that the exemption of the three hundred and ninety-third section, as it now stands, includes precisely the same

classes as the former provision.  It results that there was no error in the rulings of the Court below upon this subject.

The principles governing the application of the doctrines of estoppel to questions of title to the realty, are no longer open to discussion in the Courts of this State.  If repeated decisions of this Court can be supposed to settle any question of law, then certainly this question must be considered at rest.

This case, upon the findings of fact by the jury, falls directly within the rules laid down by this Court in the case of *Biddle Boggs* v. *The Merced Mining Company*, 14 Cal. 367, etc. Upon an elaborate consideration of the authorities, the Supreme Court in that case deduced the true rules governing the application of the doctrine of estoppel *in pais*, when applied to the title to real estate.  Those rules have become the settled law of the State upon this subject.  In the case of *McCraken* v. *The City of San Francisco*, 16 Cal. 626, the Supreme Court repeat and enforce the rules established in the Biddle Boggs case.

Again : in the case of *Carpentier* v. *Thirston*, 24 Cal. 268, the rules thus established were again recognized and enforced.


By the Court, CURREY, J.

This is an action of ejectment brought to recover a certain fifty-vara lot of land in the City of San Francisco.  The action was commenced by filing a complaint in the usual form, in July, 1863.  The defendant by her answer controverted the material allegations of the complaint, and as an affirmative defense, pleaded the Statute of Limitations, and also an estoppel *in pais*, arising from the conduct and declarations of the Honorable David C. Broderick, from whom the plaintiff claimed to derive his title to the demanded premises, of which it is alleged the plaintiff had notice by the defendant's actual possession of the lot at the time he purchased the property.  By the answer it is alleged that on the 27th of August, 1853, one Henry Braddick was in possession of the

lot, claiming the same as the owner thereof in fee simple, who at that time sold and conveyed it to the defendant for seven hundred dollars; that while the defendant was negotiating with Braddick for the purchase of the lot, and before the bargain between them was consummated, Mr. Broderick, knowing that the defendant was about to purchase the lot of Braddick and pay him therefor, disclaimed having any title to the same, and represented to the defendant that she might safely purchase the premises of Braddick; that upon the faith of such declaration and representation she consummated the purchase, paid the consideration, which was the full value of the property, obtained a deed for it from Braddick, and entered into the possession of the same; and from that time held, occupied and improved the lot, claiming it as the owner thereof adversely to Mr. Broderick, and all other persons claiming it by, through or under him.

To maintain the issue on his part the plaintiff produced and gave in evidence a grant of the lot in question, made in 1849, by the authority of the Pueblo of San Francisco, to David C. Broderick and Frederick D. Kohler; a conveyance from Kohler in 1852 of his interest in the lot to Broderick; a conveyance in October, 1858, from Broderick to John A. McGlynn; a conveyance in November, 1858, from McGlynn to Hugh P. Gallagher; and a conveyance in October, 1862, from Gallagher to the plaintiff. Mr. Broderick died on the 16th of September, 1859.

The defendant claimed title derived from Henry Braddick by deed bearing date on the 27th of August, 1853, and produced and gave the same in evidence; and also produced witnesses who testified of and concerning the declarations and representations alleged to have been made by Mr. Broderick in his lifetime, which are set forth in the defendant's answer.

The defendant was also sworn as a witness on her own behalf; and her counsel then proposed and offered to prove by her the facts set up in the answer pleaded, as an estoppel *in pais;* and also that she received a deed from the person in possession of the premises, viz: Henry Braddick, on the 27th

of August, 1853, and therefor paid him seven hundred dollars, and that she entered into possession of the lot at the time of her purchase, and during that year built a dwelling house upon and a fence around it; that while in possession she graded the lot, and had since she purchased it been in the exclusive possession and occupation of the same.

The plaintiff objected that the defendant was incompetent as a witness to testify as to any matter of fact which occurred between her and Mr. Broderick in his lifetime. The Court sustained the objection, and the defendant's counsel duly excepted.

The jury rendered a general verdict in favor of the plaintiff; and also a special verdict in response to special issues submitted to them. The result of the special verdict may be stated as follows:

First—On the 27th of August, 1853, the defendant purchased of Henry Braddick the lot in controversy, for the sum of seven hundred dollars, which she paid to him, and at the same time he executed to her a deed of conveyance for the same, bearing date on that day, when she entered into the possession of the lot, and from that time until the trial of this action, has been in the exclusive possession of it.

Second—Before the defendant received the deed from Braddick, and before she had paid him the consideration of seven hundred dollars for the premises, she informed Broderick that she wished to purchase the premises, when Broderick disclaimed having any claim or title thereto. He was then aware that she intended to purchase the lot of Braddick.

Third—The defendant, relying upon this disclaimer of Broderick, purchased the lot and paid seven hundred dollars for it, when she would not have done so if Broderick had not made such disclaimer.

Fourth—When Mr. Broderick stated that he had no claim or title to the lot, he was not apprised of the true state of his own title, and in making such statement or representation to the defendant he did not intend to deceive or defraud her.

Fifth—Mr. Broderick, in making this statement or repre-

sentation, was not guilty of gross carelessness or culpable negligence.

Sixth—The defendant was not, at the time she purchased of Braddick, wholly destitute of all knowledge of the true state of the title to the lot, nor of all means of acquiring such knowledge.

Each party moved for judgment. The Court entered judgment for the plaintiff in accordance with the general verdict. The defendant applied to the Court for a new trial, which application was denied. The appeal is from this order, and also from the judgment.

Several points are made on the part of the appellant on which she relies for a reversal of the judgment.

I. It is claimed on the part of the appellant that she was competent as a witness to testify on her own behalf as to declarations and statements made to her by Broderick, notwithstanding he had departed this life previous to the trial.

By section three hundred and ninety-two of the Practice Act, in force at the time of the trial, parties as well as strangers in interest to the controversy were competent as witnesses, except as otherwise provided in that Act.

The three hundred and ninety-third section of the Act provides that no person shall be allowed to testify, under the provisions of the next previous section where the adverse party or the party for whose immediate benefit the action or proceeding is prosecuted or defended is the representative of a deceased person, when the facts to be proved transpired before the death of such deceased person.

The point here presented may not be particularly material in this case, inasmuch as the jury by their special verdict found the facts in every essentially important particular to be as the defendant sought to establish them by her own testimony. But, notwithstanding, the question is one of much practical importance in the administration of justice, and we deem it proper to dispose of it now that it is before us.

The import and effect of the word "representative" is the question to be determined in the disposition of the exception

taken to the ruling of the Court sustaining the objection to
the competency of the defendant as a witness in her own
behalf. This statute is an innovation upon the rule of the
common law, which refuses to permit any person, even under
the sanction of an oath, who has an interest in the event of a
suit, to give evidence in support of such interest. This rule
of exclusion was founded on the known infirmities of human
nature, which is often too weak to be restrained by religious
or moral obligations, when tempted in a contrary direction by
temporal interests. (1 Starkie's Ev. 83.) The law, as it stood
before the enactment of statutes rendering parties to actions
competent as witnesses, either for or against themselves, and
the reasons existing as the foundation of the law are not to be
disregarded in the consideration of such statutes. The old
and the new laws are to be compared *in pari materia,* if neces-
sary, in order to ascertain the design of the law-making power,
and the scope and objects of the statute to be construed.

In 1851 the rule of the common law on this subject was
changed so far as to render competent as witnesses persons
interested in the event of the action, other than parties or per-
sons for whose immediate benefit the action might be prose-
cuted or defended. (Practice Act of 1851, Sections 392 and
393.) By that Act a party could examine the adverse party,
who thereby became competent as a witness on his own behalf,
if he elected so to do; but if he testified to new matter not
responsive to the inquiries put to him by the party who called
him, or not necessary to explain or qualify his answer thereto;
or to discharge, when his answer would charge himself, then
his adversary might offer himself as a witness, on his own
behalf, as to such new matter. (Id., Sections 418–421.) In
1854 (Laws of 1854, p. 84,) it was provided that "parties may
be witnesses on their own behalf when the action is brought
for the settlement of, or in relation to, the business and accounts
of a copartnership then existing, or which had previously
existed between them, to prove vouchers or items of an amount
under one hundred dollars." In 1861 (Laws of 1861, p. 522,)
the Act was so amended as to permit a party to an action to

be examined as a witness in his own behalf, under certain limitations and regulations. One limitation was, that "such examination shall not be had, nor shall any other person for whose immediate benefit the same is prosecuted or defended, be so examined, unless the adverse party or person in interest is living, nor when the opposite party shall be the assignee, administrator, executor, or legal representative of a deceased person."

In 1863 (Laws of 1863, p. 70) the Legislature again amended the Act, making parties competent witnesses, except that "no person shall be allowed to testify, * * * when the adverse party, or the party for whose immediate benefit the action is prosecuted or defended, is the representative of a deceased person, when the facts to be proved transpired before the death of such deceased person."

It is manifest, from the legislation on the subject, that the policy of opening the door to the admission of parties as witnesses, to testify generally in their own cases, has been contemplated with no light degree of apprehension; and to guard against the mischiefs and to secure the benefits arising from the change of the law, the Legislature, in respect to it, provided, as amply as practicable, to place the parties on an equality.

By the Act of 1861, the party who proposed to become a witness was required to give his adversary notice of the particular matters concerning which he intended to give evidence, that the adverse party might be prepared to meet it by his own testimony or that of other witnesses; and even with this protection against surprise a party was not permitted to become a witness in his own behalf unless the adverse party was living, nor where he might be an assignee, administrator, executor or legal representative of a deceased person. The change effected by the amendment of 1863 seems to have been intended to dispense with the necessity of the notice required under the law as it stood previously, and yet to retain in substance the portion of it which disabled one party from testifying concerning matters of which the other, as the

representative of a deceased person, could not be presumed to have any knowledge. In the Act of 1861 the words "assignee, executor, administrator or legal representative" are employed; while in the Act of 1863, in the place of these, the word "representative" is the only term used; and it is insisted on the part of the appellant that this term is alone descriptive of the executor or administrator of a deceased person. If this construction of the amendment of 1863 be proper, it would seem that the words " legal representative," in the former Act, were meaningless; for what is the difference between the terms "representative" and "legal representative," as used?

In *Grand Gulf Railroad and Banking Company* v. *Bryan*, 8 S. & M. 275, Mr. Chief Justice Sharkie said: "In legal parlance, the executor or administrator is most commonly called the legal representative." And in the same case he denied that the terms "legal representative" were limited to this use alone, saying: "In regard to things real, the heir is also the legal representative, and so is the devisee, who takes by purchase;" and that "an assignee or grantee is a legal representative of the assignor or grantor in regard to the thing assigned or granted;" and he also said that "general expressions in law must be construed to have a general application, unless there be a clear indication that they were intended to be used in a restricted sense. Representative is one who exercises power derived from another. A purchaser derives his power over the estate from his vendor." (*Phelps* v. *Smith*, 15 Ill. 574.)

We are of opinion that the word "representative" in the amendment of 1863, was intended by the Legislature to designate the executor or administrator of a deceased person, and also the person or party who had succeeded to the right of the deceased, whether by purchase or descent, or operation of law. Any other construction would leave the purchaser of an estate from a grantor, who subsequently died, in a worse condition than the grantor's executor would be had no conveyance of the estate been made. There is no reason why the plaintiff in this case should be exposed to the interested

testimony of the adverse party more than that the executor of
the deceased grantor should be, had the property in contro-
versy been a portion of the estate committed to his charge.
We do not think the point one of serious doubt. If it were
so, the construction we give to the word "representative" is
reasonable and equitable, and therefore should be adopted.

II. The defendant claims that the special verdict is incon-
sistent with the general verdict, and that by the special ver-
dict she was and is entitled to judgment; and the doctrines of
the law of estoppel *in pais* are relied on as requiring a judg-
ment for the defendant. On the part of the plaintiff it is
maintained that neither the facts pleaded by the defendant
nor the findings of the jury, as contained in their special ver-
dict, authorize a judgment different from that given and
entered in the case.

Estoppels *in pais* seem, in their common law origin, to have
arisen only in the case of those solemn and peculiar acts to
which the law gave the power of creating a right, or passing
an estate, and to which the law attached as much efficacy
and importance as to matters appearing either by deed or of
record. Mere acts, statements, or admissions of a party, when
not made or performed under seal, of record, or in the course
of some of those acts to which peculiar authority was
attached by the law, were not considered as estoppels, and
had no other weight than that of evidence, more or less
strong, but which might be explained or rebutted.

By the rules of the common law an estoppel by deed or by
matter of record must be specially pleaded, unless the circum-
stances be such as to prevent it from being placed on the
record by a plea. (7 C. B. 310; *Howard* v. *Mitchell*, 14
Mass. 242; *Bartholomew* v. *Candee*, 14 Pick. 167.) On the
other hand, estoppels by matters *in pais*, of a nature of which
Courts of law would take cognizance, could be relied on in
evidence as conclusive without being pleaded by way of
estoppel. (*Sanderson* v. *Collman*, 4 M. and Gr. 209; *Darling-
ton* v. *Pritchard*, Id. 783.)

But equitable estoppels *in pais*, generally, if not univer-

sally, are applied to prevent injury which would ensue to one from the acts or declarations of another, were he permitted to gainsay the truth of such acts and declarations. The principle is invoked and applied for the prevention of fraud, or that which is tantamount thereto, on the one side, and injury on the other; and it is but just and is in accordance with the rules of pleading in equity cases, that the party relying upon an equitable estoppel *in pais* should inform the adverse party of the nature of the cause of action or defense which he will be obliged to meet. To do this he must plead it with the same fulness and particularity as is required in cases involving like subjects of inquiry, in suits of equity. (*Brinkerhoff* v. *Lansing*, 4 John. Ch. R. 70; *Arguello* v. *Edinger*, 10 Cal. 150; *Lestrade* v. *Barth*, 19 Cal. 660; and *Downer* v. *Smith*, 24 Cal. 114; *Blum* v. *Robertson*, 24 Cal. 127; *Clarke* v. *Huber*, 25 Cal. 593.)

The answer does not show by averments that Broderick was, at the time of the conversation between him and the defendant, apprised of the true state of his own title, nor that he made the statements and representations imputed to him, and found by the jury, with the intention to deceive or defraud the defendant, or with such carelessness and culpable negligence as to amount to a constructive fraud; nor that the defendant was without knowledge of the true state of the title to the premises, or without the means of readily acquiring such knowledge, when she purchased of Braddick.

Some of these facts at least we deem material and essential to the creation of an equitable estoppel in this case; but as evidence was produced on the trial in the same manner as if these facts had been properly pleaded, and the jury have rendered a special verdict which negatives such facts, we shall consider the case upon the special verdict without regarding the objection made on behalf of plaintiff to the answer.

According to the modern decisions of the Courts, both in England and in the States of the American Union, it is established that wherever an act is done or statement made by a party which cannot be contravened or contradicted without

fraud on his part, and injury to others whose conduct, without fault on their part, has been influenced by the act or statement, the character of estoppel will attach to what would otherwise be mere matter of evidence.

In *Pickard* v. *Sears*, 6 Ad. & Ell. 447, Lord Denman, Chief Justice, said : " Where one by his words or conduct wilfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time." In order to create an equitable estoppel there must be an admission intended to influence the conduct of the man with whom the party is dealing, and actually leading him into a line of conduct which would be prejudicial to his interest, unless the party estopped be cut off from the power of retraction. For the prevention of fraud, the law holds the admission to be conclusive. (Cowen, J., in *Dezell* v. *Odell*, 3 Hill, 219.) It was held in the same case by Mr. Justice Bronson, that to constitute an estoppel *in pais* against a party, there must be, first, an admission which is clearly inconsistent with the evidence which the party proposes to give, or the title or claim which he proposes to set up ; second, that the other party has acted upon such admission and will be injured by allowing the truth of the admission to be disproved. (3 Hill, 221, 222; *Welland Canal Company* v. *Hathaway*, 8 Wend. 483.)

It will be observed that in the decision of Lord Denman, to which we have referred, the word " wilfully " is of potent import, and is made to characterize the act of the wrongdoer in effecting the injury done ; and in all the cases in which the doctrine of equitable estoppel is applied, it will be found that it rests for its foundation upon the equitable principle that is ever invoked for the prevention of the mischievous consequences of fraud. (*Copeland* v. *Copeland*, 28 Maine, 539, 540; *Commonwealth* v. *Moltz*, 10 Barr, 531 ; Adams' Equity, 151.)

In *Biddle Boggs* v. *Merced Mining Company*, 14 Cal. 367, 368, Mr. Chief Justice Field held that to the application of

the principle of equitable estoppel " with respect to the title of property, it must appear, first, that the party making the admission by his declarations or conduct, was apprised of the true state of his own title; second, that he made the admission with the express intention to deceive, or with such carelessness or culpable negligence as to amount to constructive fraud; third, that the other party was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge; fourth, that he relied directly upon such admission, and will be injured by allowing its truth to be disproved;" and he further said, " There must be some degree of turpitude in the conduct of a party before a Court of equity will estop him from the assertion of his title." We are satisfied the learned Judge who pronounced this opinion did not intend by the language employed to hold that a person must be destitute of all possible means of acquiring knowledge of the true state of the title, but rather of all convenient or ready means to such end; and with this construction we accept the doctrine declared in that case. (*Whitaker* v. *Williams*, 20 Conn. 104; 1 Story's Eq., Sec. 391; *Carpentier* v. *Thirston*, 24 Cal. 268.)

The doctrine of estoppel *in pais* should not be too readily extended when the effect of it is to divest men of their estates in lands. It should be remembered that we have a statute which makes a writing essential to the assignment or creation of an estate in real property, and that one of the objects of such statute was to render estates secure. In *Parker* v. *Barker*, 2 Met. 423, the Supreme Court of Massachusetts held that a parol stipulation made by one party and acted on by the other will not constitute an estoppel with reference to land unless it be attended by actual fraud or concealment. (5 Metcalf, 461 and 478.)

In *Jackson* v. *Sherman*, 6 John. 21, it was held that parol declarations are inadmissible to prove or disprove a title; and in *Jackson* v. *Vosburgh*, 7 John. 186, that like evidence of a disclaimer of title is inadmissible. This rule cannot be too closely adhered to, and a departure from it can only be justi-

fied when necessary to prevent frauds, against which the injured party could not guard by the exercise of proper diligence. By the special verdict it is found that the defendant was not destitute of all knowledge of the true state of the title. If she had any knowledge respecting it she cannot justly complain, if by her indifference to the ordinary means of information she failed to become fully informed of the true state of the title. *Vigilantibus non dormientibus jura subveniunt*, is an ancient maxim of the law, and forms an insuperable barrier against the claim of an improvident purchaser, and especially so when such claim is made against one who is a stranger to the contract between the vendor and vendee. (2 Kent, 285 ; 1 Sugden, V. and P. 2 ; *Ferris* v. *Coover*, 10 Cal. 632.)

The case of *Storrs* v. *Barker*, 6 John. Ch. R. 166, on which the defendant places reliance, does not, in our judgment, at all militate against the doctrine maintained by the decisions which we have cited, but may be cited in their support. In that case it was held that one knowing certain facts, which had the effect to create a title in himself to property, though not aware of such effect, if active in inducing one who, to all appearances had a title to it, to sell and another to purchase it, should not be permitted afterward to allege his ignorance of the law, in attempting to recover the property of the purchaser. In the case here referred to both parties claimed from the same source—the one through a devise made by a *feme covert*, which was void, and the other as her heir at law. The heir at law recognized for years the devise as valid, and as passing the estate to the devisee ; and while the devisee and the purchaser were negotiating in respect to the matter, which lasted through several weeks, he repeatedly advised the one to sell and the other to buy, declaring that he considered the title under the will good (pp. 167, 172) ; and for three years thereafter permitted the purchaser to make improvements, and exercise acts of ownership upon the land without interposing any claim as the heir at law, founded on the invalidity of the devise. Chancellor Kent, after referring to these circumstances, said : " If the case rested upon these facts alone, it

would fall within the rule of equity, that when one having title acquiesces knowingly and freely in the disposition of his property for a valuable consideration, by a person pretending to title, and having color of title, he shall be bound by that disposition of the property; and especially if he encourages the parties to deal with each other in such sale and purchase. It is rarely that a mistake in point of law, with full knowledge of all the facts, can afford ground for relief or be considered as a sufficient indemnity against the injurious consequences of a deception practised upon mankind; and if the person, as in this case, is not merely silent and passive, but gives explicit confirmation to the title of the party in possession, and encourages him to sell, and encourages the purchaser to buy, the case is greatly altered, and equity and policy equally dictate that he and not the purchaser ought to suffer. His ignorance of the law ought not to protect him from the rule of equity. * * If he may be allowed to plead his voluntary ignorance in destruction of equitable rights, growing out of his own acts and assertions, the grossest impositions and the greatest fraud might be practised with impunity."

The statement which the jury have found that Broderick made, to the effect that he had no claim to the lot, was a mistake of fact which the jury, upon all the evidence before them, say was not made with any intent to deceive or defraud the defendant, nor with gross carelessness or culpable negligence, and we think it would be carrying the doctrine of estoppel *in pais* to an extent that would encourage the grossest frauds and perjuries, and would result in many instances in divesting the owner of his title and transferring it to another upon evidence of declarations unwittingly and innocently made, were we to hold that the facts found by the jury create an estoppel against the plaintiff's assertion of his title to the demanded premises.

We may say in respect to parol evidence of the declarations and admissions of persons made long anterior to the trial, upon which an estoppel *in pais* may be sought to be founded, that it cannot be too carefully scrutinized by Courts and juries.

In all cases it is the most dangerous species of evidence that can be admitted in a Court of justice, and the most liable to abuse. In most cases it is impossible, however honest the witness may be, for him to give the exact words in which the declaration or admission was made. Sometimes, even the transposition of the words of a party may give a meaning entirely different from that which was intended to be conveyed. The slightest mistake or failure of recollection may totally alter the effect of the declaration or admission. And more than this, it is most unsatisfactory evidence, on account of the facility with which it may be fabricated, and the impossibility, generally, of contradicting it when false. (*Law* v. *Merrills*, 6 Wend. 277; *Jackson* v. *Sherman*, 6 John. 21; *Lench* v. *Lench*, 10 Vesey, 517; *Cleveland* v. *Burton*, 11 Vermont, 139; *Snelling* v. *Utterback*, 1 Bibb, 611; *Morris* v. *Morris*, 2 Bibb, ——; *Bernard* v. *Flournoy*, 4 J. J. Marshall, 102; *Perry* v. *Gerbeau*, 5 Martin, N. S. 18.)

III. The defendant requested the Court to give certain instructions to the jury, which were refused, and now assigns this action of the Court as erroneous.

The first requested instruction was: " That where two innocent parties must suffer, that party who had been the cause of another's loss must lose."

In *Lickbarrow* v. *Mason*, 2 T. R. 70, Mr. Justice Ashurst said: " Wherever one of two innocent persons must suffer by the act of a third, he who enabled such third person to occasion the loss must bear it." But great caution should be exercised in applying this principle, and the Court should be satisfied that the case is one calling for its application, before the question is submitted to the jury, as to which of the parties is entirely *in delicto*. The instruction requested is ambiguous, if not entirely unintelligible. It does not inculcate the doctrine enunciated by Mr. Justice Ashurst. In legal contemplation the person who causes a loss to another is not innocent, and it would have been improper for the Court to have charged the jury that, both parties being innocent, one of them could be found guilty of a wrong to the other.

The second requested instruction was : " That the grant made by Geary to Broderick and Kohler was not recorded in August, 1853, so as to impart notice to defendant."

If the fact of constructive notice to the defendant of the existence of this grant had any bearing on the case, the ruling of the Court refusing this charge is justified by the case of *Touchard* v. *Keyes*, 21 Cal. 202, and the statutes referred to therein.

The third requested instruction—" That, as the law stood and was construed by the Supreme Court of California in August, 1853, and prior thereto, D. C. Broderick had no title to Lot 1,090 "—was irrelevant to any question before the jury, and the Court was right in refusing the request.

The fourth requested instruction—" That a man claiming to own land was bound to know the state of his own title"— was properly refused, because such is not in all cases the law. The case of *Storrs* v. *Barker*, cited in support of the doctrine of the instruction, goes no further than to hold that the presumption is that every one is acquainted with his own rights, provided he has had reasonable opportunity to know them.

The exceptions taken to the general charge of the Court have already been disposed of in the consideration of the several questions examined, and it is unnecessary to notice them in detail.

IV. The last point made on the part of the defendant is that the plaintiff's cause of action was barred by the Statute of Limitations.

The transcript of the record contains this statement : "Proceedings for confirmation of pueblo title considered in evidence, by which it appeared that the City of San Francisco had, under the Act of Congress on that subject, petitioned the United States Board of Land Commissioners, in the year 1853, by petition in due form, for a confirmation of the pueblo land, claiming the same under grant and the laws and proceedings of the Mexican Government, and which land embraced the land in controversy in this action, and that said claim is now, on due proceedings, prosecuted on appeal, pending and yet

undetermined in the District Court of the United States for the Northern District of California, and that no final confirmation has yet been made therein."

By the sixth section of the Statute of Limitations (Wood's Digest, 46,) an action may be maintained by a party claiming real estate or the possession thereof under title derived from the Spanish or Mexican Governments, or the authorities thereof, if such action be commenced within five years from the time of the final confirmation of such title by the Government of the United States or its legally constituted authorities.

In *Johnson* v. *Van Dyck*, 20 Cal. 228, the Court held that the "final confirmation" to which the Act of Congress of 1851 refers is the final adjudication of the tribunals of the United States upon the validity of the title of the claimant under the Mexican grant; that until the survey which follows such adjudication is made and approved, the title is not definitively confirmed to any particular premises; that the confirmation to which the Act of this State refers is the definitive confirmation; and that the Statute of Limitations begins to run only from the time the patent may be issued. (*Richardson* v. *Williamson*, 24 Cal. 289.)

Thus the statute and the authorities cited and referred to settle this point.

We have noticed every question presented on the part of the appellant, and the conclusion to which we have arrived is that there is no cause for disturbing the judgment rendered.

Judgment affirmed.