## SHERMAN et al. v. SHERMAN et al.

Where grantors intended to transfer land to a railroad company under the power conferred on it to purchase, take, hold, etc., land, by Comp. Laws 1887, §§ 2980, the deed will be construed in the light of the statute, which became a part of the contract.

Comp. Laws 1887, § 2980, gave a railroad corporation, authorized to maintain a railroad in the territory power to acquire by purchase real estate and other property necessary for the construction, etc., of its railroad, stations, and other accommodations reasonably necessary to accomplish the object of its incorporation, to hold and use it, to lease or otherwise dispose of it, or sell it when not required for railroad uses. Section 2999 gave a railroad company power to purchase and use real property for a price to be agreed upon with the owners. Section 3002 provided that, when real property of a minor was taken, the guardian might agree and settle with the railroad for all damages and claims. **Held**, that the legislative intent was that a fee-simple title should pass to the railroad company coextensive with the power of holding and disposition of the lands so acquired.

While the common-law quitclaim was not considered a conveyance in England, in the United States by statute and common usage it is recognized as one of the modes of real estate conveyance for transferring title.

The word "claim" is a broad and comprehensive term, and includes title and ownership to real property when used in relation thereto.

The words "remise," "release," and "quitclaim" each mean to discharge.

The word "quit" is a contraction of the word "acquit", meaning to discharge.

An agreement between the owners of land and a railroad company stated that, in consideration of a certain sum paid, the owners "do hereby discharge and forever release" the railroad company from all damages and claims whatsoever on account of the taking, etc., of the land, had the same operative effect of a formal quitclaim deed, the operative words of which are "remise, release and forever quitclaim," and served to discharge and release the railroad company from all claims of ownership and title to the lands, constituting the transaction a grant of real property, which as thoroughly divested the grantors of their title as a warranty deed with full covenants of title would have done.

Comp. Laws 1887, § 2980, gave a railroad company, authorized to maintain a railroad in the territory, power to acquire by purchase real estate necessary for construction of its railroad, etc., with full power of disposition. Section 3002 provided that, when real property of a minor was taken, the guardian might agree and settle with the railroad company for all damages and claims. Section 2854 provided that in all cases where an absolute power of disposition was given, not accompanied by a trust, and no remainder was limited on the estate of the holder of the power, he was entitled to an absolute fee. Section 3254 provided that a fee-simple title was presumed to be intended to pass by a grant of real property, unless it appeared from the grant that a lesser estate was intended. Section 3238 provided that a reservation in a grant should be interpreted in favor of the grantor. The owners of property conveyed it in 1887, while the above statutes were in force, to a railroad company by an instrument obviously intended to transfer the title contemplated by section 2980; the guardian of certain minor owners settling with the railroad for all claims, as provided by section 3002. No trusts were mentioned in the agreement. The consideration was the full value of the fee title, and the agreement recited that the grantors "do hereby discharge and forever release" the railroad company from all damages and claims whatsoever on account of the taking, holding, and appropriating of the land, also that the railroad deemed the land necessary "for the use of its railroad, but for no other purpose," and that the land was conveyed "for the purpose aforesaid, but no other." There was no reservation of any right to re-enter

in case the grantee ceased to use the land for the purpose specified. Held, that there was no reservation of any right in the grantors, nor did the recitals limiting the use constitute an easement in view of the consideration exacted, but the transaction was one of bargain and sale for the transfer of the fee-simple title.

Corson, J., dissenting.

(Opinion filed, June 26, 1909.)

Appeal from Circuit Court, Minnehaha County. Hon. JOSEPH W. JONES, Judge.

Action by Abbie Phillips Sherman and others against P. F. Sherman and others. Judgment of dismissal, and plaintiffs appeal. Affirmed.

*Boyce & Warren,* for appellants.

The right acquired by the power of eminent domain extends only to an easement in the land taken, unless the statute plainly provides for the acquisition of a larger interest. In any case, however, an easement only would be taken, unless the statute plainly contemplated and provided for the appropriation of a larger interest. Cooley Const. Lim. 559; Lyon v. McDonald, 9 L. R. A. 295; New Jersey Zink & Iron Co. v. Morris Canal & Banking Co., 1 L. R. A. N. J. E. 133-136; Fitchburg Ry. Co. v. Frost, 16 N. E. 773; Heyneman v. Blake, 19 Cal. 579; Quick v. Taylor, 16 N. E. 588; Williams v. Western Union Ry. Co., 5 N. W. 482; Hurd v. City of Brooklyn, 60 N. Y. 242; Kansas Central Ry. Co. v. Allen, 22 Kansas 285.

*C. O. Bailey, W. S. Kenyon* and *J. M. Dickinson,* for respondents.

Under the South Dakota statute, when a railroad company is given a donation of real property, it only acquires an easement and can only use the property for railroad purposes, but when it acquires property by condemnation and pays for it, it acquires not only an easement but a title which it can dispose of as it may see fit, by lease or by sale, when the property is no longer needed in the operation of the railroad. Chap. 46, Laws 1879; Malone v. Toledo, 34 Ohio St. 541; 28 Ohio St. 643; Gurney v. Minneapolis Elevator Co., 63 Minn. 70; Rexford v. Knight, 11 N. Y. 308; Quigley v. City of Boston, 100 Mass. 544.

McCOY, J.   This case comes to this court on appeal from Minnehaha county circuit court.   There is no dispute about the facts.   Both sides rely upon the findings of fact as found by the trial court.   From such findings it appears: That the plaintiffs Abbie Phillips Sherman, Alice Phillips Wilcox, Flora C. Phillips, Charles A. Phillips, Rossie C. Phillips, and Josie L. Phillips were minors, domiciled in the county of Minnehaha in September, 1887, and that Hattie C. Phillips had been duly appointed the guardian of said minors, and that the said minors were at that time tenants in common with Annie C. Phillips of certain real estate situated in the city of Sioux Falls, and consisting of 5.86 acres, and being about 719 feet long and about 342 feet wide, and being a little in excess of two ordinary city blocks.   That in September, 1887, the Cherokee & Dakota Railway Company was a corporation duly organized and authorized to construct and operate and maintain a railway within the territory of Dakota, and that in September, 1887, the said railway company was engaged in the construction of a line of railroad from Cherokee, Iowa, to Sioux Falls, and that said Cherokee & Dakota Railway Company, being desirous of taking, holding, and appropriating the said parcel of land for station grounds, tracks, side tracks, and switches, entered into an agreement with the plaintiffs to pay to plaintiffs the sum of $6,850, the then market value of the fee title of said parcel of land, and did then and by virtue of such agreement pay to plaintiffs the said sum of money, in full payment for all damages and claims whatsoever by reason of the taking, holding, and appropriating of said land by said railway company.   That the said contract and agreement between plaintiffs and said Cherokee & Dakota Railway Company was evidenced by the following instrument in writing: "Whereas, the Cherokee & Dakota Railway Company deem it necessary to take, hold, and appropriate for the purpose of station grounds, tracks, side tracks switches, and the location, construction and convenient use of its railroad but for no other purpose, the following described real estate, the property of Annie C. Phillips, Abbie C. Phillips, Alice C. Phillips, Flora C. Phillips, Charles A. Phillips, Rossie C. Phillips and Josie L. Phillips (being the two blocks above mentioned), and whereas, on the

18th day of October 1883, the undersigned Hattie C. Phillips, was, by the probate court of Minnehaha county, aforesaid, appointed the guardian of the persons and estate of all said minors and still is such guardian, and, whereas, said Annie C. Phillips, in her own right, and said Hattie C. Phillips, as such guardian of all said above-named minors, with the approval of the judge of the probate court of said county, which approval is appended to and made a part of this instrument, agreed with said railroad company upon the sum of $6,850 in full payment for all damages and claims whatsoever, in favor of said Annie C. Phillips. * * * and every of them by reason of the taking of said real property, and have settled with said railroad company for all said damages and claims for said sum of money, and whereas, said railroad company has, with authority, consent, and concurrence of said Annie C. Phillips, and with the approval of said judge of probate court, paid to said Hattie C. Phillips, as such guardian. for and on behalf of said Annie C. Phillips, and said minors, the said sum of money. and said Hattie C. Phillips as such guardian has accepted and received the same in full settlement of said damages and claims. Now this indenture, made this 26th day of Sept., 1887, between said Annie C. Phillips, in her own right, and said Annie C. Phillips, * * * each and all by said Hattie C. Phillips, their guardian, as aforesaid, parties of the first part, and the said Cherokee & Dakota Ry. Co., party of the second part, witnesseth: That the said parties of the first part, in consideration of the sum of $6,850, to them in hand paid, the receipt of which is hereby acknowledged, do hereby discharge and forever release the said Cherokee & D. Ry. Co., from all damages and claims whatsoever. on account of the taking, holding, and appropriation of said above-described land for the purpose aforesaid, but no other. In witness whereof, the said Annie C. Phillips, in her own right, and the said Hattie C. Phillips, as such guardian as aforesaid, have hereunto set their hands and seals the day and year last above written. Annie C. Phillips. [Seal.] Hattie C. Phillips, Guardian. [Seal.]" And this instrument was duly acknowledged and thereafter duly recorded on December 12, 1887, and has appended and annexed thereto the approval of the said judge of probate court. That thereafter,

during the year 1889, the said Cherokee & Dakota Railway Company conveyed all its right, title, and interest to the said premises to the Dubuque & Sioux City Railway Company, and that thereafter, about February, 1891, the said Dubuque & Sioux City Railway Company leased said premises to the Illinois Central Railroad Company, and that thereafter, in May, 1893, the Illinois Central Railway Company leased a part of said premises to defendants, who thereupon erected thereon a machinery warehouse used in and about the private business of defendants, and that defendants ever since have and now still occupy said portion of said premises with their said warehouse. That none of plaintiffs have ever occupied said premises since September, 1887, since the making of said instrument. The plaintiffs brought this action to quiet title and to regain possession of the portion of said premises occupied by defendants with said warehouse, and to recover rents and profits. Judgment was entered in favor of defendants dismissing plaintiffs' complaint upon the merits, from which judgment plaintiffs have appealed, and contend that such judgment is not supported by the findings of fact and is against law.

The vital question is: What was the effect of the said written instrument under the laws of the territory of Dakota in force at the time of its execution? Did said instrument pass an unconditional fee title or an easement only to the said Cherokee & Dakota Railway Company? Section 488, Rev. Civ. Code, was formerly section 2980, Comp. Laws, and was in force during the year 1887. This section, among other things, provided that every railroad corporation authorized to construct, operate, or maintain a railroad within this territory shall have power "to acquire under the provisions of this act or by purchase, all such real estate and other property as may be necessary for the construction, maintenance and operation of its railroad, and the station, depot grounds, and other accommodations reasonably necessary to accomplish the object of its incorporation; to hold and use the same, to lease or otherwise dispose of any part or parcel thereof, or sell the same when not required for railroad uses, and no longer necessary to its use." Section 2999, Comp. Laws (section 507, Rev. Civ. Code), also provided as follows: "Any railroad corporation may purchase and use real property for

a price to be agreed upon with the owners thereof; or the. damages to be paid by such corporation for any real property taken as aforesaid when not agreed upon, shall be ascertained and determined by the circuit court * * * in conformity with the provisions of the Code of Civil Procedure." Section 3002, Comp. Laws (section 508, Rev. Civ. Code), also provided: "Whenever any railroad corporation shall take any real property as aforesaid, of any minor, * * * the guardian of such minor may agree and settle with said corporation for all damages or claims by reason of the taking of such real property, and may give valid releases and discharges therefor ,upon the approval thereof by the judge of the probate court." Under these sections of the Compiled Laws in force in 1887 a railway corporation might acquire real estate by two methods—by condemnation or by purchase—and the provisions of section 3002 were applicable to either method. It must be remembered at all times while considering this case that the Cherokee & Dakota Railway Company did not acquire the land in question by virtue of condemnation proceedings against the will and consent of the grantors, but by a contract of purchase, for a fixed price, which was the full market value of the fee, and which contract was entered into by plaintiffs, who were the grantors, freely and voluntarily; but, on account of the fact that some of plaintiffs at the time of the transaction were minors, the approval of the judge of probate became necessary in order to satisfy the provisions of section 3002. Neither do appellants contend that said railway company acquired said land by condemnation, or the exercise of eminent domain. In the reply brief appellants state: "Since in this case the voluntary grant was made no condemnation could have taken place, and consequently we are not interested in determining what title would have passed by condemnation proceedings." The transaction was a grant based on contract of the parties, and from the language used in the instrument it was evidently the intention to transfer said land to said railway company under the power conferred on said railway corporation to purchase, take, hold, lease, and dispose of the same under the provisions of section 2980, Comp. Laws. That being the intention of the parties, then the instrument sould be construed in the light of these provisions of the law,

as, under such circumstances, the provisions of this law would become a part of the contract. The power conferred on the railway corporation by section 2980 is to purchase, take, hold, lease, dispose of, and sell the whole or any part of the lands thus acquired when no longer required for railway uses, thus giving such railway corporation full and absolute power of disposition over the property purchased under the provisions of this statute. Sections 2999 and 3002 provide the method or means for carrying out and making effective the power to purchase, take, hold, lease, etc., conferred by section 2980. Referring to the language of section 3002, "When any railroad corporation shall take any real property as aforesaid (that is, by purchase or condemnation) the guardian * * * may agree and settle with said railway corporation for all damages or claims by reason of the taking * * * and may give valid releases and discharges therefor, upon the approval of the judge of the probate court," thus showing that the framers of this law had in mind the very form of instrument here used as being the proper form of instrument for transferring lands acquired by purchase under section 2980. It seems to be quite evident that the legislative mind intended that a fee title should pass to the railway company, and that there is no way of escaping this conclusion. It is plainly apparent from the reading of the statute that the title to be acquired under these provisions is co-extensive and correlative with the power of holding and disposition of the lands so acquired. The plain intent of the legislative assembly was that a complete title should be vested in the company. The very wording and form of this grant in question are such as to make it clear that plaintiffs intended to convey and the company to acquire the full title contemplated by this statute—a fee-simple title. Some reference has been made on argument of counsel to the Union Pacific Railway act (Act July 2, 1864, c. 216, 13 Stat. 356), and the provisions thereof, and it is assumed, possibly correctly, that the territorial Legislature followed that act, and that under the Union Pacific Act it was provided that the guardian should have full power to make and execute a conveyance which would "vest the title thereto in said company," and that said provision has been omitted from our statute, and it is contended from this that the legislative assembly

did not intend that title should pass to the railway company. If that contention were correct, the Legislature would have also omitted subdivision 3 of section 2980. But, when the Legislature had already provided that the guardian might release and discharge all claims by reason of the appropriation, the effect was to pass title to the company just as effectually as if the language of the Union Pacific act had been all used. Further use of the language of the Union Pacific act would have been unnecessary verbiage. Under subdivision 3 of section 2980 the Legislature intended that a fee title should pass, and the parties to this instrument acted and intended to convey title with that provision of the statute in view.

Let us next consider the operative effect of the instrument in question. The granting portion of this instrument is as follows: "Witnesseth, that the said parties of the first part in consideration of teh sum of $6,850, to them in hand paid, the receipt of which is hereby acknowledged, do hereby discharge and forever release the said Cherokee & D. Ry. Co., from all damages and claims whatsoever, on account of the taking, holding, and appropriating of the above-described land for the purpose aforesaid, but no other." The specific operative words of this instrument are, "discharge and forever release from all claims whatsoever." The operative language here used is the exact equivalent of the common-law quitclaim deed. The operative words of the common-law quit-claim were, "remise, release and forever quitclaim." 2 Bouvier, 808; 23 Am. & Eng. Ency. 588; Jones on Law of Real Property Conveyancing, 209, 311. While the common-law quitclaim was not considered a conveyance in England, in the United States by statute and common usage it is recognized as one of the modes of real estate conveyance for transferring title, and has been so recognized in this state. Parker v. Randolph, 5 S. D. 549, 59 N. W. 722, 29 L. R. A. 33. It will be noticed that the operative words of this instrument, "discharge and forever release," not only from all damages, but also from "all claims whatsoever" by reason of the said taking, holding and appropriation. If the word "damages" only had been used in this instrument, then it possibly would not have transferred any title at all, but it "discharges and forever releases from all claims whatsoever." The word "claim" is a broad and

comprehensive term, and includes title and ownership to real prop-
erty, when used in relation thereto. 1 Bouvier, 332; 6 Am. & Eng.
Ency. 97; 7 Cyc. 180; United States v. Spaulding, 3 Dak. 93, 13
N. W. 357, 538. The words "remise," "release" and "quitclaim"
each mean "to discharge." The word "quit" is a contraction of the
word "acquit," meaning "to discharge." Hence by the use of the
words "discharge and forever release from all claims whatsoever"
had the same operative effect in the instrument in question as if
used in a formal quitclaim deed, and served to discharge and re-
lease the said railway corporation from all claims whatsoever of
ownership and title to the said lands, and thus constituting the
transaction a grant or transfer of real property. It is generally
held that a deed of release and quitclaim is as effectual for the pur-
pose of transferring title to land as the most skillfully drawn war-
ranty deed. Brown v. Oil Co., 97 Ill. 214; Parker v. Randolph,
5 S. D. 549, 59 N. W. 722, 29 L. R. A. 33; Jones on Real Prop-
erty Conveyancing, 828. If the words "discharge and forever re-
lease from all claims whatsoever," used and employed in the in-
strument in question, operated to create a grant and transfer of
title, then the same was a broad and comprehensive grant, regard-
less of the verbiage used, and as thoroughly and completely divest-
ed the grantors of their title to said land as would have been ac-
complished by a deed of warranty, with full covenant of title.

Under section 2980, Comp. Laws, the said railway company
was granted power to acquire said land by purchase, with full
power of disposition, viz., to hold, lease, dispose of, and sell the
whole or any part thereof. Section 2854, Comp. Laws (section 361,
Rev. Civ. Code), was in force in 1887, and provides: "In all cases
where an absolute power of disposition is given not accompanied
by a trust, and no remainder is limited on the estate of the holder of
the power, he is entitled to an absolute fee." Section 3254, Comp.
Laws (section 947, Rev. Civ. Code), provides that: "A fee-simple
title is presumed to be intended to pass by a grant of real property,
unless it appears from the grant that a lesser estate was intended."
Section 3238, Comp. Laws (section 931, Rev. Civ. Code), provides:
"A grant is to be interpreted in favor of the grantee, except that
a reservation in a grant, and every grant made by a public officer,

as such, is to be interpreted in favor of the grantor." The terms "trust," "remainder," and "reservation" all have well-defined meanings in conveyancing; and no trust, remainder, or reservation are included or mentioned in the instrument in question. The use of the words "for railroad purposes only" will not create a reservation. There was no reservation of any right to reenter in case the said corporation ceased to use the land for the purposes specified in the instrument. There is no reservation of anything in this instrument.

If the Cherokee & Dakota Railway Company acquired a fee title under the instrument in question, what effect, then, were the words therein, "for the use of its railroad, but for no other purpose," and "for the purpose aforesaid, but no other"? The decision of this court in Huron v. Wilcox, 17 S. D. 625, 98 N. W. 88, forecloses that question. It was held in that case that the transaction was bargain and sale under section 1299, Rev. Civ. Code. In this case the transaction was bargain and sale, but the transfer of title was accomplished under the powers and provisions of specific law relating to transfers to railway corporations. In that case it was further held that the city of Huron was empowered by law to purchase, hold, lease, transfer, and convey real property (and being the same power conferred by law upon the railway corporation in question), and that the language in the deed, "for city hall purposes only," was not sufficient to constitute a condition subsequent, nor a restriction or reservation, upon the estate granted, that would defeat the title granted, upon a showing that the property was not being used for city hall purposes. In rendering the decision in Huron v. Wilcox the court said: "A deed will not be construed to create a conditional estate unless the language used unequivocally indicates an intention on the part of the grantor to that effect. The right is not given to the grantor to enter and resume possession in case the premises are not used for city hall purposes, and the expression appears to be merely a declaration of the purpose for which the purchase was made. Without express words relating to forfeiture or re-entry, no authority has been found going to the extent of holding a conveyance conditional and subject to be divested that was executed for a valuable consideration with a recital

that the land conveyed shall not be used for any other purpose than; that specified." To the same effect is. Packard v. Ames, 16 Gray: (Mass.) 327; Vail v. Long I, Ry., 106 N. Y. 283, 12 N. E. 607; Curtis v. Board of Ed., 43 Kan. 138, 23 Pac. 98; Greene v. O'Connor, 18 R. I. 56, 25 Atl. 692, 19 L. R. A. 262.

There are many cases holding that recitals in grants limiting the use of the property will constitute an easement. An easement is created by a conveyance of a right of way to a railroad company for a nominal consideration, where the grant is expressed to be on condition that the land shall be used for railroad purposes: only, and that, if it shall cease to be so used, it shall revert to the grantor; and, where land was deeded for use as an alley, but with, the further provision that the grant should be null and void if it ceased to be used for that purpose, it was held an easement. Jones on Real Property Conveyancing, 653. In all this class of cases there were sufficient words used in the granting instrument itself to create the condition. No such words as "if it shall cease to be so used it shall revert to the grantor," or "if it shall cease to be so used it shall be null and void," are used in the instrument in question; and it is very apparent why authorities of this class are not applicable. There is another class of cases where the instrument itself expressly recites that only an easement or a right of way is intended to be granted, but that is not this case either. There is still another class of cases holding that where the property is granted for a specific purpose, and where the language used in the granting instrument would not be sufficient to create a conditional estate, that it will be construed to grant an easement. So far as we are able to find, there are but two of these cases. Robinson v. Missisquoi R. Co., 59 Vt. 426, 10 Atl. 522, and Flaten v. Moorhead, 51 Minn. 518, 53 N. W. 807, 19 L. R. A. 195. In the Vermont Case the instrument recited "for the use of a plank road." The principal reasons assigned for holding the grant an easement were that the land conveyed was a strip four rods wide through an entire farm, and that the only use to which it could be put was a right of way, and that the consideration was grossly inadequate for a grant in fee. In the Minnesota case the language of the

granting instrument was "provided that said property shall be for-ever held for a city park," and in construing that grant to be an easement the court, by Mitchell, J., said: "Taking into considera-tion that the grantee was a municipality and that the consideration was $1, we conclude that an absolute fee did not pass, but only an easement." In the case of Soukup v. Topka, 54 Minn. 66, 55 N. W. 824, the Minnesota court later, by the same justice, Mitchell, in considering a grant, containing the words "for a road to and from the above-described premises," in rendering the decision and after referring to the decisions in the case of Robinson v. Missis-quoi R. Co. and Flaten v. Moorhead, said: "In the present case all these extrinsic facts are absent. The deed conveys the land it-self. with an attempted restriction upon its use, which is entirely consistent with the passing of the fee. There is nothing in this deed reserving to the grantor any use of or dominion over the land, and the rule is, if the grant be of the use and dominion over the land, it carries the land itself." In this connection is also sec-tion 195, Rev. Civ. Code, which provides: "The ownership of prop-erty is absolute when a single person has absolute dominion over it, and may use it or dispose of it according to his pleasure sub-ject only to general laws." If, under sections 2980, 3002, Comp. Laws, the said Cherokee & Dakota Railway Company acquired the said land by purchase with full power to use or lease, hold, dispose of, or sell as it saw fit, then the ownership of the land itself passed by the instrument in question, and not an easement. There is nothing in the instrument in question reserving in the grantors any use of or dominion over the land, nor any provision whereby the grantors might re-enter or resume possession in case it was not used for railway purposes. The use of the words therein, "for railway purposes, and no other," is precisely the same as used in many of the cases above cited, which hold the language not suffi-cient to create a restriction or reservation, but simply amounted to an attempt to restrict the use. The land granted is about two city blocks in extent, indicating station and depot grounds (rather than right of way for tracks), upon which valuable terminal structures might some time be erected, and the full market value of the fee was paid as consideration. All the attending circumstances indi-

cate a contract of bargain and sale, and an intention to transfer the fee title, and not an easement.

Finding no error in the record, the judgment of the circuit court should be affirmed.

CORSON, J. (dissenting). I am unable to concur in the views expressed by the majority of the court, or in the decision affirming the judgment of the court below; and, as the case involves very important questions, I deem it proper to state somewhat at length my views as to the law applicable to the case.

The contention of the appellants, briefly stated, is that by the release or conveyance from Annie C. Phillips and Hattie C. Phillips as guardian in 1887 the railroad company acquired an easement only in the premises so released, and that the leasing to Sherman Bros. & Bratager and to the defendants was for a purpose not included in the easement, and therefore that the plaintiffs retained the right to use the property for all purposes excepting those comprised in the easement, and that they are entitled to recover the rental value of the property from the time it was demised by the Illinois Central Railroad Company to the Sherman Bros. & Bratager, and to the present defendants. Appellants further contend that the alleged conveyance by Annie C. Phillips and Hattie C. Phillips as guardian was not approved as required by the probate court, and therefore that the conveyance was invalid, and not binding upon the heirs of the said J. L. Phillips, deceased. It will be observed that by the terms of the so-called conveyance the said Annie C. Phillips in her own right, and Hattie C. Phillips as guardian of the minor heirs, made the alleged conveyance as follows: "Now this indenture witnesseth; that the plaintiffs do hereby discharge and forever release the said Cherokee & Dakota Railroad Company from all damages and claims whatsoever, on account of the taking, holding, and appropriation of said above-described land for the purpose aforesaid, but no other." The counsel for the defendants in support of the conclusion and judgment of the learned circuit court contend that under the laws of the territory of Dakota as they existed at the time of the so-called original conveyance the railroad company acquired a fee-simple title to the premises in controversy, and, under the law as it then ex-

isted,· the ·said railroad company had· full power ·and .authority to, make a lease or leases, under which·defendants claim, for any pur-. pose· they. might. deem· proper as provided in subdivision · 3 of sec- tion 2980 of the Compiled Laws of 1887, which reads as .follows :. "Every corporation formed under this article, and every· railroad corporation·authorized to construct, operate or maintain a railroad within this territory .shall be a body corporate by, the name. desig- nated in its articles, shall have perpetual ·succession, shall. have the right to sue and be sued, may have a common seal and ,alter the same at pleasure, and shall also have power :. * * * to acquire un- der the provisions of this article or by purchase, all such real es- tate and. other property as may be. necessary. for the construction, maintenance. and operation of its railroad, and the stations, depot . grounds, and other accommodations reasonably necessary to ac- complish the objects of its incorporation; to hold and use the same, to lease or otherwise dispose of any part or parcel thereof, or sell the same when not required for railroad uses, and no longer neces- sary to its use."

The question is therefore clearly presented as to whether or not the railroad company acquired by the release from the Phil- lips heirs an actual fee in the property, or only an easement there- in for railroad purposes. If the railroad acquired a title in fee, then, under the section of the statute above quoted, it was. fully authorized to lease or dispose of the property owned by it, and not required by it for railroad purposes, to any party and for any purpose that it might deem proper. If, on the other hand, the railroad company simply acquired an easement or right· of way for railroad purposes only, then the company was not authorized to lease or dispose of any portion of the property not required by it for railroad purposes, and the plaintiffs would be entitled to re- cover a fair rental value of the property during the time it was occupied and used for warehouse purposes by the defendants, as in such case the use of the property would be limited to its use by the railroad company for railroad purposes only. Prior to 1877 Congress seems not to have provided for condemnation proceed- ings· or· authorized the territory to pass laws for .that purpose.· By an act approved. March 3, 1875 (Act March 3, 1875, c. 152, 18

Stat. 482 [U. S. Comp. St. 1901, p. 1568]), by the third section it is provided: "That the Legislature of the proper territory may provide for the manner in which private lands and possessory claims on the public lands of the United States may be condemned; and, where such provision shall not have been made, such condemnation may be made in accorance with section 3 of the act entitled 'An act to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific Ocean, and to secure to the government the use of the same for postal, military and other purposes, approved July first, eighteen hundred and sixty-two,' approved July second, eighteen hundred and sixty-four." In 1877 the Legislature of this territory enacted a railroad condemnation act which provides as follows: "Any railroad corporation may purchase and use real property for a price to be agreed upon with the owners thereof; or the damages to be paid by such corporation for any real property taken as aforesaid, when not agreed upon, shall be ascertained and determined by commissioners to be appointed by the judge of the district court of the county or judicial subdivision, wherein such real estate is situated, in conformity with the provisions of this article. * * * Whenever any railroad corporation shall take any real property as aforesaid, of any minor, any person insane or otherwise incompetent, or of any married woman whose husband is under guardianship, the guardian of such minor, insane or incompetent person, or such married woman with the guardian of her husband, may agree and settle with said corporation for all damages or claims by reason of the taking of such real property and may give valid releases and discharges therefor upon the approval thereof by the judge of the probate court." Civ. Code 1877, §§ 451, 454. This act was modeled after the Union Pacific Railroad act passed by Congress in 1864 (Act July 2, 1864, c. 216, 13 Stat. 356), and contained provisions almost identical with those of that act, but a more careful comparison of the provisions of the two acts will show a manifest distinction between the two. In the Union Pacific Railroad act (section 3), it is provided "that the guardian may agree with the company as to the damages sustained * * * and upon such agreement being made and approved by the court having supervision of the official acts of

said guardian, said guardian shall have full power to make and execute a conveyance thereof to said company which shall vest the title thereto in the said company." By the Dakota act it is provided for a like agreement and settlement, and then says: "That the guardian may give a valid release and discharge therefor upon the approval thereof by the judge of the probate court." It will thus be noticed that, while by the Union Pacific Railroad Company act the guardian is authorized to make and execute a conveyance of the property to said company which shall vest the title thereto in the said company, by the Dakota act it is provided that the guardian may grant valid releases and discharges therefor upon the approval thereof by the judge of the probate court. This distinction is very important, as by the Union Pacific Railroad Company act the guardian is authorized to vest the title of the minors in the railroad company, by the Dakota act the guardian is only authorized to release the damages, but no provision is made for the conveyance of the title in fee to the company.

It is contended by the appellants that the distinction between the two acts is important, in that the act of 1877 enacted by the Legislature of the territory of Dakota clearly shows that it was not the intention of that body to vest in the railroad company anything more than an easement or right of way for railroad purposes, and that was the only effect of the instrument executed by the guardian, Hattie C. Phillips, and Annie C. Phillips to the company. There is much force in the contention of the appellants. The recitals in the release clearly show that it was not the intention of the Legislature that a title in fee should be vested in the railroad company. This instrument, as will be observed, does not purport to convey the property to the railroad company, or any interest therein, but simply releases the company from any damages the parties may sustain by reason of the construction of said railroad. It is important to notice the first recital in this instrument, which is: "Whereas, the Cherokee & Dakota Railroad Company deem it necessary to take, hold and appropriate for the purpose of station grounds, tracks, sidetracks, switches, for the location, construction, and convenient use of its railroad but for no other purpose, the following described real estate."

The release seems to have been drawn with great care and with the evident purpose of limiting the use of the property described in the release to railroad purposes only, and the language used in the instrument clearly indicates that it was the intention of Annie C. Phillips and Hattie C. Phillips as guardian to release their interest in the property for right of way purposes only. It seems to be the general rule that such instruments should be strictly construed in accord with the manifest intention of the parties, and it seems to be the general; if not the universal, rule, unless the intention to vest in the company a title in fee simple is clearly expressed to construe such instruments as vesting in the company a right of way only. Washington Cemetery v. Prospect Park & C. I. R. Co., 68 N. Y. 591; Lyon v. McDonald, 78 Tex. 71, 14 S. W. 261, 9 L. R. A. 295, and note; New Jersey Zinc & Iron Co. v. Morris Canal & Banking Co., 44 N. J. Eq. 398, 15 Atl. 227, 1 L. R. A. 133-136; Fitchburg Ry. Co. v. Frost, 147 Mass. 118, 16 N. E. 773; Heyneman v. Blake, 19 Cal. 579; Quick v. Taylor, 113 Ind. 540, 16 N. E. 588; Williams v. Western Union Ry. Co., 50 Wis. 71, 5 N. W. 482; Heard v. City of Brooklyn, 60 N. Y. 242; Kansas Central Ry. Co. v. Allen, 22 Kan. 285, 31 Am. Rep. 190. In such cases the railroad company is not authorized to use the property taken by it for any purpose other than some proper railroad purpose, and where, as in the case at bar, it attempts to lease portions of the property to individuals or companies to be used for their own private purposes, such leases are absolutely void, and parties occupying the premises under such leases are liable to the owners in fee for the value of the use and occupation of such premises while holding the same under release. Lance's Appeal, 55 Pa. 25, 93 Am. Dec. 722; Proprietors of Locks and Canals v. Nashua & Lowell R. R. Co., 104 Mass. 1, 6 Am. Rep. 181; Forney v. Fremont, E. & M. V. R. Co., 23 Neb. 465, 36 N. W. 806; Lyon v. McDonald, 78 Tex. 71, 14 S. W. 261, 9 L. R. A. 295; Roby v. New York Central & Hudson R. R. Co., 65 Hun. 532, 20 N. Y. Supp. 551; Cincinnati, etc., R. R. Co. v. Geisel, 119 Ind. 77, 21 N. E. 470; Roby v. Yates, 70 Hun. 35, 23 N. Y. Supp. 1108. In Lance's Appeal, supra, the Supreme Court of Pennsylvania in discussing this question says: "The right of

'the commonwealth to take private property without the owner's consent on compensation made, or to authorize it to be taken, exists in her sovereign right of eminent domain, and can never be lawfully exercised but for a public use—supposed and intended to benefit the public, either mediately or immediately. The power arises out of that natural principle which teaches that private convenience must yield to the public wants. This public interest must be at the basis of the exercise, or it would be confiscation and usurpation to exercise it. This being the reason for the exercise of such power, it requires no argument to prove that, after the right has been exercised, the use of the property must be held in accordance with and for the purpose which justified its taking. Otherwise it would be a fraud upon the owner, and an abuse of power. Hence it is that no one can pretend that a railroad company may build private houses and mills, or erect machinery not necessarily connected with the use of their franchise, within the limits of their right of way. If it could, stores, taverns, shops, groceries, and dwellings might be made to line the sides of the road outside of the track, a thing not to be thought of under the terms of the acquisition of the right of way. * * * They were not empowered to use the exclusive right of way granted to each for any other independent purpose than that for which it was granted. The fee remained in the private owner, and outside of the authorized use, which must be public or incidental to the public use, the proprietary rights are in the original owner."

In the case of Proprietors of Locks, etc., v. Nashua & Lowell R. R. Co., 104 Mass. 1, 6 Am. Rep. 181, the railroad company had taken by right of eminent domain, a right of way across certain property, and had constructed thereon a freighthouse which they continued to use for several years when they established a freight depot elsewhere, and then leased to a firm the freight depot and grounds so formerly used by it, to be used by them in their business as flour and produce dealers. And in the action by the original owners of the property against the lessees to recover judgment, and on appeal, the Supreme Court of Massachusetts uses the following language: "Although the railroad corporation may derive some advantage in its freighting business from the carriage of

goods for its tenants, and from the receipt and delivery of their goods at these buildings, instead of its own freighthouses, yet we think it would be a distortion of the agreed statement to regard these circumstances as sufficient to qualify the character of the occupation of the buildings so as to bring it within the range of any purpose for which the corporate franchises were granted. * * * The fee of the land remains in the original owners, notwithstanding the location of the road. It is true the nature of the use for which the land is taken is such as may require, and therefore authorize, complete possession and control by the railroad corporation. The occupation and use of land which it is entitled to enjoy is declared to be 'permanent in its nature, and practically exclusive.' * * * But, however extensive the right which the corporation thus takes by its location, it is not a fee, nor a freehold estate, but an easement only; not a corporeal interest, but an incorporeal right. Its right of occupation, however exclusive, is incidental only, and as a means of exercising the privileges and performing the functions defined by its charter. * * * The owner of the fee in land thus subjected to a public easement may maintain an action of trespass or a writ of entry against any one whose entry or acts upon the premises would support the action, unless he can justify under the authority of the party having the easement. * * * Any uses of the land confessedly for other purposes, or not apparently for purposes permitted by its charter, are not protected by its authority. For such uses the owner may have his redress by an appropriate action. * * * In the present case, the occupation of the buildings upon the demanded premises for the general purposes of trade and mechanical or manufacturing business by lessees having no other connection with the operations or interests of the corporation than as its tenants paying rent, and the conversion of those buildings by the corporation from their original design into private stores or shops for the purpose of so changing their use, placed them beyond the scope of the corporate purposes and functions. It is such an occupation of the land as, without warrant from the public authority, involves an assumption of ownership, and entitles the demandants to treat the corporation as tenant of the freehold by disseisin. The fact that the corporation has a valid easement, which

entitles it to a greater or less use of the land for other purposes, is no impediment to a recovery by the demandants in this action; for the judgment will be rendered subject to such valid easement as the tenant actually has. * * * But they are entitled to a judgment which will establish their title and rights as owner of the fee, and secure them proper damages for the wrongful use of the land, as well as their costs of suit. * * * As to the land within the limits of the location, the tenant has made use of it for a valuable purpose. Its charter affords no justification of that use, and no protection against the claim of the owner of the fee for the mesne profits against any disseisor."

It is further contended by respondents in support of the conclusions and judgment of the learned trial court that the plaintiffs are now estopped from asserting any claim to the property by reason of their laches in remaining so long silent, after they attained their majority, before taking any proceedings to assert their rights as heirs of the estate of J. L. Phillips, deceased, as, if they were not bound by the proceedings resulting in the release signed by their guardian, they had full knowledge of all the facts pertaining to the occupation of the premises by the defendants for a number of years prior to the commencement of the present action. There is no finding, however, in the record that the defendants were in any manner misled or made any expenditure of money by reason of the omission of the plaintiffs to assert their rights at an earlier date. All the proceedings in regard to the transactions between the heirs through their guardian and the railroad companies were matters of record and defendants had constructive notice therefore of the rights they were acquiring by reason of their lease from the railroad company. In order to invoke a doctrine of estoppel, it devolved upon the defendants to show affirmatively (1) "that the party making the admission by his declarations or conduct was apprised of the true state of his own title; (2) that he made the admission with the express intention to deceive, or with such careless and culpable negligence as to amount to constructive fraud; (3) that the other party was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge; and (4) that he relied directly upon such admission,

and will be injured by allowing its truth to be disproved." Biddle Boggs v. Merced Mining Co., 14 Cal. 279-366; Brant v. Virginia Coal & Iron Co., 93 U. S. 326, 23 L. Ed. 927. The former is regarded as a leading case upon this subject. In the latter case the learned Supreme Court of the United States, speaking by Mr. Justice Field, who wrote the opinion in the case of Biddle Boggs v. Merced Mining Co., supra, says that: "It is difficult to see where the doctrine of equitable estoppel comes in here. For the application of that doctrine there must generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as' to a mount to constructive fraud, by which another has been misled to his injury. 'In all this class of cases,' says Story, 'the doctrine proceeds upon the ground of constructive fraud or of gross negligence, which in effect implies fraud; and, therefore, when the circumstances of the case repel any such inference, although there may be some degree of negligence, yet courts of equity will not grant relief. It has been accordingly laid down by a very learned judge that the cases on this subject go to this result only: That there must be positive fraud or concealment or negligence so gross as to amount to constructive fraud.' 1 Story's Eq. 391. To the same purport is the language of the adjudged cases. Thus it is said by the Supreme Court of Pensylvania that 'the primary ground of the doctrine is that it would be a fraud in a party to assert what his previous conduct had denied when on the faith of that denial others have acted. The element of fraud is essential either in the intention of the party estopped or in the effect of the evidence which he attempts to set up.' Hill v. Epley, 31 Pa. 334; Henshaw v. Bissell, 18 Wall. 271, 21 L. Ed. 835; Biddle Boggs v. Merced Mining Co., 14 Cal. 368; Davis v. Davis, 26 Cal. 23, 85 Am. Dec. 157; Commonwealth v. Moltz, 10 Barr. (Pa.) 531, 51 Am. Dec. 499; Copeland v. Copeland, 28 Me. 539; Delplaine v. Hitchcock, 6 Hill (N. Y.) 16; Hawes v. Marchant, 1 Curt. 136, Fed. Cas. No. 6,240; Zuchtman v. Roberts, 109 Mass. 53. * * * It is also essential for its application with respect to the title of real property that the party claiming to have been influenced by the conduct or declarations of another to his injury was himself not only destitute of knowledge of the true

·state of the title, but also ·of any convenient ahd available means of acquiring such knowledge. Where the conditions of the title are known to both parties or both' have the same means of ascertaining the truth, there can be no estoppel. Crest v. Jack, 3 Watts (Pa.) 240; Knouff v. Thompson, 16 Pa. 361."

As before stated, the defendants in the case at bar did or could have ascertained from the record all the facts pertaining to this release by the heirs of the estate of Phillips, and, so far as the record discloses, neither of these plaintiffs as the heirs of said Phillips made any representations to the defendants, or did any act calculated to influence or mislead them. I am of the opinion, therefore, that the contention of the respondents that the plaintiffs were estopped from asserting their rights by reason of their delay in instituting this action cannot be sustained. It may be proper to remark that this court has recently held that the doctrine of laches is not applicable to actions at law, but are limited to actions in equity. Burleigh v. Hecht et al., 22 S. D. 301, 117 N. W. 367. Hence the delay of the plaintiffs in asserting their rights short of the time limited by the statute of limitations cannot avail the defendants in this action. Section 7 of article 17 of the Constitution of this state provides: "No corporation shall engage in any business other than that expressly authorized in its charter, nor shall it take or hold any real estate except such as may be necessary and proper for its legitimate business." By section 13, article 6, Const., it is provided: "The fee of land taken for railroad tracks or other highways shall remain in the owners, subject to the use for·which it is taken."

These provisions of the state Constitution, though adopted subsequently to the act of the Legislature, seem to be in harmony with that act, and clearly support the construction that I have given to the act, and my conclusion therefore is that the learned circuit court erred in entering judgment in favor of the defendants, and in my opinion the judgment of that court should be reversed.