COATES & HOPKINS REALTY COMPANY, Appellant, v. KANSAS CITY TERMINAL RAILWAY COMPANY, CONTINENTAL ILLINOIS BANK & TRUST COMPANY and E. E. AMICK, Trustees, Respondents; and ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY; CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY; CENTRAL TRUST COMPANY OF NEW YORK and OLIVER M. SPENCER, Trustees; KANSAS CITY, FORT SCOTT & MEMPHIS RAILWAY COMPANY; BANKING TRUST COMPANY, NEW ENGLAND TRUST COMPANY, GUARANTY TRUST COMPANY, BANKERS TRUST COMPANY and N. A. McMILLAN, Appellants.—43 S. W. (2d) 817.

Court en Banc, November 17, 1931.

1119

1120

*McVey & Freet* for appellant Coates & Hopkins Realty Co.

*H. J. Nelson* and *Langworthy, Spencer & Terrell* for appellant Chicago, Burlington & Quincy Railroad Company and Central Trust Company of New York.

*E. T. Miller, Henry S. Conrad, L. E. Durham* and *Hale Houts* for appellants Kansas City, Fort Scott & Memphis Railway Company, St. Louis-San Francisco Railway Company, New England Trust Company, Guaranty Trust Company, Bankers Trust Company and N. A. McMillan.

*Samuel W. Sawyer, John H. Lathrop* and *George O. Pratt* for respondents Kansas City Terminal Railway Company, Continental Illinois Bank & Trust Company and E. E. Amick; *McCulloch & McCulloch* of counsel.

1124

DAVIS, C.—The petition comprises an action to ascertain and determine title to certain land situate in Kansas City, known as the old Union Depot site. It was converted into an equity suit by the answers and cross-petitions of defendants Kansas City Terminal Railway Company and Illinois Merchants Trust Company and Charles G. Hutcheson, trustees, and was tried as such. The decree and judgment vested the fee simple title to said land in defendant Kansas City Terminal Railway Company, subject to a first mortgage of fifty million dollars executed to said trustees for the use of bondholders. The plaintiff and the remainder defendants appealed from the judgment entered.

The underlying facts are established by a stipulation executed by the parties to the controversy and admitted in evidence. Summarized it shows that Kersey Coates is the common source of title to the land in litigation. By deed dated October 27, 1859, Coates and wife conveyed an undivided one-third interest therein to William A. Hopkins. In 1920, all the heirs of Coates and Hopkins conveyed their interest in said land to plaintiff corporation, organized to prosecute the suit. For brevity, the land in question is designated as parcels six, seven and eight. By deeds dated respectively December 26, 1868, February 1, 1870, August 15, 1873, and January 26, 1876, the title to all of the undivided one-third interest in parcels six and eight so conveyed to said Hopkins was duly transferred, for valuable consideration, to Missouri, Fort Scott & Gulf Railroad Company, a Kansas corporation (incorporated, however, under the name of Kansas & Neosho Valley Railroad Company, and) qualified to do business in Missouri. The title to the one-third undivided interest in parcel seven so conveyed to said Hopkins was transferred, for valuable consideration, by deed dated November 18, 1870, to Hannibal & St. Joseph Railroad Company, a Missouri corporation.

By warranty deed dated December 21, 1867, and by quitclaim deed dated January 26, 1876, Kersey Coates and wife, for valuable consideration, conveyed an undivided two-thirds interest in parcels six and eight to Kansas City & Cameron Railroad Company, a Missouri corporation, which was thereafter consolidated with the Hannibal & St. Joseph Railroad Company. (The Kansas City & Cameron Railroad Company was originally incorporated, prior to the consolidation mentioned and prior to the delivery of said deeds, as Kansas

City, Galveston & Lake Superior Railroad Company.) Also by warranty deed dated November 20, 1870, for valuable consideration, said Coates and wife conveyed an undivided two-thirds interest in parcel seven to Hannibal & St. Joseph Railroad Company. On and subsequent to November 30, 1870, the Hannibal & St. Joseph Railroad Company was vested with all the title of the land designated as parcel seven. In parcel six, the Hannibal & St. Joseph Railroad Company held an undivided two-thirds interest and the Missouri River, Fort Scott & Gulf Railroad Company an undivided one-third interest. The title to parcel eight was held by the Hannibal & St. Joseph Railroad Company and the Missouri River, Fort Scott & Gulf Railroad Company in the same proportions as they held parcel six, or the Hannibal & St. Joseph Railroad Company was vested with the entire title. Said three parcels of land were used thereafter and continuously for general railroad purposes by said railroad companies holding title thereto, until condemned by said Union Depot Company.

In 1877, the Union Depot Company, a Missouri corporation, organized under the Union Depot Act (Laws 1871, p. 53), in the circuit Court of Jackson County, acquired title to the three parcels of land by condemnation proceedings. Afterwards by deed dated November 1, 1910, said Union Depot Company conveyed said three parcels of land to the defendant Kansas City Terminal Railway Company, which since then has held possession of said land.

By deed of trust or mortgage dated January 3, 1910, the Kansas City Terminal Railway Company mortgaged said three parcels of land (said parcels being covered by an after-acquired property clause in said mortgage) to certain named trustees to secure bonds of the par value of $50,000,000, and the Illinois Merchants Trust Company and Charles G. Hutcheson, defendants herein, are the present duly qualified and acting trustees under said mortgage.

Defendant Chicago, Burlington & Quincy Railroad Company is the successor to and owns all the right, title and interest, if any, of the Hannibal & St. Joseph Railroad Company, in and to said lands, if any such interest existed or came into existence after the consummation of the condemnation proceedings. Subject to the same qualifications, the Kansas City, Fort Scott & Memphis Railway Company owns all the interest of the Missouri River, Fort Scott & Gulf Railway Company, subject, however, to a ninety-nine-year lease from August 23, 1901, to the St. Louis & San Francisco Railroad Company, to which leasehold rights, if any, the said defendant St. Louis & San Francisco Railroad Company is the successor.

The stipulation further provides that nothing therein shall be construed either as an admission of the validity or invalidity of any claims of title of the plaintiff or any of the defendant, but that the

purpose is to decrease the record as to details; that plaintiff claims that the grantees became vested with an easement only, and that such contention is not foreclosed by the stipulation; that either of the parties may introduce, if competent, relevant and material documents or proceedings, or certified copies, or oral or written evidence; that original documents shall govern the records and records shall govern certified copies of the record.

The evidence adduced warrants the finding that the deeds from Coates and Hopkins were unconditional, except that one of the deeds provided for a reversion on condition that the land is to be used by said railroad company for the purpose of erecting thereon a general passenger and freight depot or depots and other general railroad purposes and its connections, but later, in writing, for valuable consideration the condition was waived and it was agreed that the title of said grantee shall become absolute and without condition.

The Laws of 1871, page 53, relative to the incorporation of a Union Depot Company, authorized the incorporation of such company for the establishment and maintenance of a union passenger station for passengers or freight depots or for both, to take and hold such real estate as it might acquire by conveyance or condemnation, needed for the establishment of such union station or depot, provided that no company organized under the provisions of this act shall hold or acquire any real estate except such as shall be actually necessary for such depot purposes. The charter of said Union Depot Company recited, in substance, that it was formed for the establishment and maintenance of a union passenger depot in the City of Kansas.

On March 18, 1877, after its incorporation, the Union Depot Company, in the Circuit Court of Jackson County, filed a condemnation action against the railroad holders or owners of said three parcels of land and against Kersey Coates and Charles G. Hopkins, executor of William A. Hopkins, deceased, averring that it needed said three parcels of land for the purpose of constructing a union passenger depot. On July 25, 1877, the circuit court entered a decree vesting the fee simple absolute title to said land in the Union Depot Company and decreeing that each and all the defendants be and they are hereby barred, cut off and foreclosed of and from all right, title, estate and interest, legal and equitable therein. Thereafter the said circuit court, after giving notice and an opportunity to Coates and Hopkins to assert any claim which they might have to the money awarded by the commissioners, decreed the award to the railroad defendants. The Union Depot Company entered into possession of said premises condemned, and in 1878 a union passenger station was constructed thereon, and from 1878 until 1914, the premises were used as a union passenger station for substantially all the steam railroads entering Kansas City.

On March 28, 1907, under the Laws of 1899, the Kansas City Terminal Railway Company was incorporated. Its purposes, in general, were the construction of a broad-guage railroad, with tracks, switches and spurs, to connect with other railroads and industries or business concerns, and to construct and operate a union station for passenger or freight depots, and to take and hold such real estate and railroad and other property as it may acquire by conveyance or by condemnation. In 1909, the Kansas City Terminal Railway Company began the construction of a new passenger station, approximately two and one-half miles distant from the old passenger station, which new station was completed in 1914. On November 1, 1914, the new Union Station was opened to passenger traffic, after which date the old union passenger station buildings were razed and demolished, and railroad tracks constructed upon the site.

The old Union Depot Company operated a depot on the aforesaid three parcels of land continuously until it deeded the parcels on November 1, 1910, to the defendant Kansas City Terminal Railway Company, after which the old depot was operated by said Terminal Company until the completion of its new station on November 1, 1914, from which date all passenger trains entering Kansas City received and discharged passengers from the new station.

The grantees of Coates and Hopkins, upon acquiring the land, erected a frame building on parcel six for general passenger and freight uses, and railroad yards were located by two or three railroads on the property. The tracks constructed thereon were used for various railroad purposes. Certain tracks across the land were used for freight purposes and that use has been continuous to the present time.

Prior to the incorporation of the Union Depot Company in 1875, three roads executed a certificate required by the Session Acts of 1871, that they expected to use the depot upon its completion. These railroads and others, as they were admitted, paid the operation and maintenance expenses of the depot.

In 1879, the company erected a union depot building, with appurtenant tracks numbered one to nine, inclusive, and tracks four to nine, inclusive, were through tracks. The building was used for passenger, mail and express business. The various railroads, parties to the operative agreement, used the tracks of the old Union Depot for the transfer and hauling of cars. Under special contracts providing compensation, one of the tracks was used for through freight. These freight uses continued until the demolition of the old depot building. The uses grew in volume and were continuous and uninterrupted, but, owing to the necessity of expansion, it was determined that conditions required a new station building to be constructed in a more convenient locality. Thus, in 1906, the Kansas

City Terminal Railway Company was incorporated, having, in addition to the power of a union depot company, the general powers of a railroad. In 1909, the ten railroads then owning all the stock of the old and new companies, transferred their stock in the Union Depot Company to the Kansas City Terminal Railway Company, and in 1910 all the assets of the Union Depot Company were conveyed to said Terminal Company. Upon the demolition of the old depot building, the stub tracks were connected for through service. Certain tracks have been used sometimes as interchange tracks, upon which cars were placed to be received by or delivered to other railroads for switching. The operating agreement of 1909 provides for the erection of a new Union Station, railroad tracks and other appurtenances. Each party to the agreement is granted the right to use the union passenger station and all the tracks and facilities of the Terminal Company for both passenger and freight uses, with the freight use, however, subordinate to the passenger uses. The Terminal Company properties constitute a unified terminal system of the first rank, comprising a building and tracks with capacity of two hundred passenger trains a day, and tracks connecting with the various tracks of the railroads and industries.

Since the demolition of the old Union Depot building, the three parcels of land in question have been directly in use for passenger purposes in the following respects:

(a) From approximately 1920 to 1922, the Missouri Pacific used tracks on said parcels over which to operate its through trains from St. Louis to Colorado and to and from the new Union Station.

(b) For the operation of Chicago & Alton passenger engines between the Chicago & Alton roundhouse and the new Union Station.

(c) For the passage of troop trains during the World War, and at other times for immigrant and circus trains.

(d) For the storage of Pullman cars during conventions.

(e) For entrance to the new Union Station by the trains of the Chicago, Burlington & Quincy Railroad Company, Wabash Railroad Company, and Chicago, Rock Island & Pacific Railway Company, whenever the West Bluffs' line ordinarily used by these three railroads for this purpose, was blocked. While this was in the nature of an emergency use, in order to prevent interruption of their passenger service, it was an important use. As earth and rock on the occasions of a heavy rainfall slid and fell from the bluffs above on to the West Bluffs' line tracks, these emergencies were not infrequent.

Other facts, if any, will be adverted to in the opinion.

The laws enacted by the General Assembly of Missouri, relating to the incorporation of various railroads and to the acquisition of real property, are, in substance and in part, as follows:

The act incorporating the Louisiana & Columbia Railroad (Laws 1837, p. 247) provides that said railroad "may take, hold, use, possess and enjoy the fee simple or any other title or estate, in any real estate, lands, tenements, or hereditaments, and the same to sell and dispose of at pleasure."

The act incorporating the Hannibal & St. Joseph's Railroad Company (Laws 1847, p. 156) provides that said railroad "shall be and they are hereby created a body corporate and politic in fact, . . . the stockholders shall be in perpetual succession, and be able to sue and be sued, implead and be impleaded in all courts of record and elsewhere, and to purchase, receive, have, hold, and enjoy to them and their successors lands, tenements, and hereditaments, goods, chattels, and all estates, real, personal and mixed of what kind or quality soever and the same from time to time to sell, mortgage, grant, alien and convey. . . . and shall in all things be subjected to the same restrictions and entitled to all the privileges, rights and immunities which were granted to the Louisiana and Columbia Railroad Company . . . approved January the 27th, 1837, so far as the same are applicable to the company hereby created as fully and completely as if the same were herein re-enacted."

An act incorporating the Kansas City, Galveston & Lake Superior Railroad Company (Laws 1857, p. 162) provides that said railroad "may take, hold, use, possess, and enjoy the fee simple, or other titles, in and to any real estate, and may sell and dispose of the same." (Kersey Coates and William A. Hopkins were designated as eligible to election as members of the first board of directors.)

An act (Laws 1867, p. 145) provides that the Kansas & Neosho Valley Railroad Company "shall also have authority to acquire and own within said county [Jackson] all necessary grounds for stockyards, machine shops, and depots, and to make arrangements with other railroad companies for a union depot for their joint use, and for the joint use of their respective tracks."

I. The defendant Kansas City Terminal Railway Company ascribes and plaintiff denies to a railroad corporation the attribute and power to take and enjoy the fee simple title to real estate, acquired by agreement, purchase and deed upon a valuable consideration.

That the warranty, executor's and quitclaim deeds, executed between the years 1867 and 1873 by Coates and wife and Hopkins, were sufficient to convey to the original railroad grantees the fee title to the real estate in litigation, provided said grantees were imbued with power to take a fee title, does not seem to be controverted.

Approved March 19, 1866, laws affecting corporations were enacted, which are designated as Section 1, page 20, and Section 2, page 27, Laws 1865-6. The identical sections since then have been operative and are now in force (Secs. 4555, 4655, R. S. 1929). In part they read:

(Section 1, page 20, Laws 1865-6): "Every corporation, as such, has power: . . . fourth, to hold, purchase, mortgage or otherwise convey such real and personal estate as the purposes of the corporation shall require, not exceeding the amount limited in its charter, or the law creating it, and also to take, hold and convey such other property, real, personal or mixed, as shall be necessary or requisite for such corporation to acquire in order to obtain or secure the payment of any indebtedness or liability belonging to the corporation."

(Section 2, page 27, Laws 1865-6): "Every corporation formed under this article shall, in addition to the powers hereinbefore conferred, have power: . . . Second. To take and hold such voluntary grants of real estate and other property as shall be made to it to aid in the construction, maintenance and accommodation of its railroads; but the real estate received by voluntary grant shall be held and used for the purpose of such grant only."

The preceding sections appear as portions of an act of the General Assembly entitled, "An act concerning private corporations," separated into nine chapters, and approved March 19, 1866. Article One relates to the general powers and liabilities of corporations, and Article Two to railroad companies. They appear, however, with other chapters and sections, the component parts of one bill.

In view of the seeming ruling in Allen v. Beasley, 297 Mo. 544, 249 S. W. 387, it behooves us to analyze the words "voluntary grants," as found in Section 2, page 27, of the Laws of 1865-66 (Sec. 4655, R. S. 1929). "Voluntary" is defined in its legal aspect as "without valuable consideration; gratuitous." "Grant" means give, bestow or confer, to transfer property by an instrument in writing. This State has held that a voluntary conveyance is a conveyance without any valuable consideration. [Gentry v. Field, 143 Mo. 399, 45 S. W. 286-7.] To same effect: Hagerman v. Buchanan, 14 Am. St. 1. c. 739. It is said in London v. G. L. Anderson Brass Works, 197 Ala. 16, 72 So. 359, that, in courts of law, a voluntary deed is one which is given without consideration, as that term is defined in law, which must be substantial as opposed to nominal merely. The court, in Nicholas & Co. v. United States, 249 U. S. 34, 1. c. 39, 63 L. Ed. 461, 39 Sup. Ct. Rep. 218, speaking of the word "grant," in the sense there used, say, "Like its synonyms 'give' and 'bestow,' it expresses a concession, the conferring of something by one person upon another."

A history of the surrounding conditions, which it is permissible to consider (Southwest Mo. Light Co. v. Scheurich, 174 Mo. 235, 73 S. W. 496), shows that, at the time of the passage of the bill, railroad corporations were in progress of organization and construction and that towns, settlements, communities and individuals desired railroad connections. On occasions, land was offered and deeded to a corporation before the railroad was. built, and the corporation later abandoned its purpose, due probably to a lack of finances and forethought, resulting that the corporation acquired the land without fulfilling its promise. Or, it may be that the corporation, subsequent to acquiring the fee in land, determined to take another route. The General Assembly, we think, was actuated by these conditions in providing a reverter as to voluntary grants of land to railroads. We construe the words, "voluntary grants," as used in what is now Section 4655, Revised Statutes 1929, to mean that a grant of land, deeded to a railroad corporation, reverts to the original grantor thereof upon abandonment, when it was conveyed without valuable consideration, or when it was conveyed to induce a railroad corporation to take a defined route. This view is accentuated by the context of what is now Section 4555, Revised Statutes 1929, which provides that every corporation, as such, has power to hold, purchase, mortgage or otherwise convey such real and personal estate as the purposes of the corporation shall require. The meaning of Section 4555 is clear and plenary, and empowers every corporation, within its required purposes, to hold, purchase and convey land as though a person. What are now. Sections 4555 and 4655 are component parts of the same act, and are to be interpreted so both may stand with full force and effect, if possible. [Palmer v. Omer, 316 Mo. 1188, 295 S. W. 123.] To construe Section 4655 to hold that a railroad corporation in any event takes nothing more than an easement in land, purchased by it upon a valuable consideration, would delete the plenary force of Section 4555 that it appears to have. In Macke v. Byrd, 131 Mo. 682, l. c. 690, 33 S. W. 448, 52 Am. St. 649, it is said: "All provisions of law on one topic should be considered in determining the meaning of any particular portion thereof, and such a construction should be given to the latter as will keep all the provisions of the law on the same subject in harmony, and give effect to all, when possible." [State ex rel. v. Gordon, 181 S. W. 32.] As shown. by Section 4555, the general legislative purpose was to grant to a corporation the power to hold real estate for its corporate purposes as a person, and such power could be diminished or destroyed expressly or by clear implication only. When statutes appear to be in conflict, it is the duty of the court to harmonize them, if possible, according. to the general legislative intent. [Dysart v. City of St. Louis, 11 S. W. (2d) 1045, 62 A. L. R. 762.]

A question may arise as to the interpretation, in Section 4555, of the phrase ''as the purposes of the corporation shall require.'' Clearly, the General Assembly comprehended that corporations, in the course of their business life, conclude that certain real estate acquired by it may become unsuitable for its purposes; and it invested corporations generally, we think, with the power to take a fee title and to convey a fee title. So with railroad corporations. It would be an anomaly to hold that all corporations except railroads may have the full benefit of their investments.

II. Even though a railroad corporation has the power of condemnation, no owner of the land may be compelled against his consent to execute a deed in fee. [Constitution, Art. II, Sec. 21.] Seemingly there is no restriction upon the amount of land a railroad may acquire or condemn, so long as it is needed for railroad purposes. But if the land is acquired or held for other than corporate purposes, action relative thereto may be taken by the State.

We have construed Section 4555, supra, as conferring upon private corporations generally the power to acquire, hold and convey the fee simple title to real estate (Sylvester Watts Smyth Realty Co. v. Amer. Surety Co., 238 S. W. 494), if within their corporate purposes. A prerogative of a corporation at common law was the acquisition of the fee title to land. [Page v. Heineberg, 40 Vt. 81; Baker v. Railroad, 122 Mo. 396, 1. c. 406, 30 S. W. 301; Callaway M. & M. Co. v. Clark, 32 Mo. 305; 14a C. J. 494-496.] As applied to railroads, the power appears in force in England. [Norton v. Railroad, 9 Ch. D. 623 (Aff. 13 Ch. D. 268); 14a C. J. 509.] Even a corporation of limited duration may take a fee. [Nicoll v. Railroad, 12 N. Y. 121.]

As other private corporations, unless the power is expressly or impliedly denied them, may acquire and hold real estate in fee, which inures to the benefit of creditors and stockholders prior to and upon dissolution, we are unable to comprehend a sound or logical reason for the denial of such right to a railroad corporation, its creditors and stockholders. Any other rule than that a railroad may take a fee in land upon purchase and a valuable consideration would not only deprive the corporation, its creditors and stockholders of justly entitled assets, but would tend to injure the public relative to rates and service.

Neither our Constitution nor our statutes, except land acquired by condemnation proceeding or by voluntary grant, unless the deed defines the estate granted, discloses any limitation upon the power of a railroad corporation to hold, purchase or convey the fee in land when acquired by bargain and sale upon a valuable consideration. Moreover, it appears to be the general rule, in force and effect in

many jurisdictions, that a railroad corporation, when authorized by a statute or its chapter, may take by purchase a fee simple title in land for railroad purposes, notwithstanding it acquires only an easement through condemnation proceedings. [51 C. J. 535; Baker v. Railroad, 122 Mo. 396, l. c. 411, 30 S. W. 301.] The cases cited below confirm the doctrine: Radetsky v. Jorgensen (Colo.), 202 Pac. 175; Gilbert v. Railroad, 185 Fed. 102; Kynerd v. Hulen, 5 Fed. (2d) 160; Midstate Oil Co. v. Railroad (Cal.), 270 Pac. 216; Johnson v. Railroad (Ga.), 150 S. E. 845; Spierling v. Ohl, 232 Ill. 581, 83 N. E. 1068; Cincinnati Railroad Co. v. Railroad (Ind.), 123 N. E. 1; Chicago, M. & St. P. Ry. Co. v. Town of Churdan (Iowa), 195 N. W. 996; Des Moines City Railroad Co. v. Des Moines (Iowa), 159 N. W. 450; Nye v. Taunton Branch Railroad Co., 113 Mass. 277; Epworth Assn. v. L. & N. Ry. Co. (Mich.), 211 N. W. 99; Carr v. Miller, 105 Neb. 623, 181 N. W. 557; Nicoll v. Railroad, 12 N. Y. 121; Yates v. Van De Bogert, 56 N. Y. 526; Oklahoma Ry. Co. v. Paving Co. (Okla.), 170 Pac. 216; Chamberlain v. Railroad (S. C.), 19 S. E. 743; Stevens v. Railroad (Tex.), 212 S. W. 639; Page v. Heineberg, 40 Vt. 81; Shreve v. Railroad, 109 Va. 706, 64 S. E. 972; Killgore v. Cabell Co. Ct., 80 W. Va. 283, 92 S. W. 562; Hicks v. Smith (Wis.), 85 N. W. 512; Clevenger v. Railroad (Mo.), 210 S. W. 867; L. & N. Railroad Co. v. Boykin, 76 Ala. 560; Mitchell Estate v. Railroad, 167 Ga. 728, 146 S. E. 556; Proprietors of Locks & Canals on Merrimack River v. Railroad, 245 Mass. 52, 139 N. E. 839; Breckinridge v. Railroad, 33 Atl. (N. J.) 800; New York, B. & E. Ry. Co. v. Motil, 81 Conn. 466, 71 Atl. 563; People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, 7 Am. St. 684, 2 L. R. A. 255; Sherman v. Sherman, 23 S. D. 486, 122 N. W. 439; Midland Railroad Co. v. Young, 22 Can. (S. C.) 190.

III. Chouteau v. Railway, 122 Mo. 375, l. c. 394, 22 S. W. 458, 30 S. W. 299, is cited to support the contention that a railroad corporation, even by a deed in fee, upon a valuable consideration, takes no greater estate in land than an easement. The record of the case does not develop a majority opinion, for at most three judges only concur in the easement rule. The concurring opinion of BARCLAY, J., holds, in substance, "that, in acquiring the estate of a husband in land subject to public use, the inchoate right of dower therein is suspended, during the existence of the public use." BLACK, C. J., and MACFARLANE, J., dissented. GANTT, J., also dissented in an opinion (Baker v. Railroad, 122 Mo. 396, l. c. 400, 30 S. W. 301). Consequently, no ruling opinion obtained, except as to the result, unless it can be said, which we think it cannot, that the opinion of BARCLAY, J., is the majority opinion.

If it was a majority opinion, it goes no further than holding that land devoted to public or sovereign use may not be subjected to the right of dower. We are not prepared, nor is it necessary, to hold that ruling and opinion of BARCLAY, J., is erroneous.

It also behooves us to mention Allen v. Beasley, 297 Mo. 544, 249 S. W. 387. Because the agreed statement of facts does not show that the land in question was conveyed upon a valuable consideration promised or paid, we do not feel justified in overruling the decision. If it was not conveyed upon a valuable consideration, it was a voluntary grant.

However, so far as said cases rule, even though *dicta*, that a railroad corporation may not, upon a valuable consideration, by agreement and purchase and by a deed in fee, take the fee in land so purchased, they are overruled. Moreover, all other cases affecting railroad corporations, if any, in conflict with this ruling, are overruled. Of course, voluntary grants, lands condemned for railroad tracks and conveyances of rights of way only to railroad corporations are a very different matter, and our ruling herein is not intended to affect or to apply to such acquisitions of land.

IV. Plaintiffs further assert that the condemnation decree, by which the Union Depot acquired from the railroad owners title to the land in question, conveyed to said Union Depot Company no greater title in said land than an easement. Our ruling that the original railroad grantees acquired a fee in the land disposes of the question so far as plaintiffs are concerned, for obviously, under our ruling, they have no claim to or interest in the land by reversion or otherwise. However, other defendants (railroads) are also appellants, and, as the judgment of the trial court ran against them, we must determine the title as to all parties herein.

In a condemnation suit in the Circuit Court of Jackson County, the Union Depot Company, in 1877, acquired title to the land in question from the railroad owners. The decree of the circuit court vested the fee simple title in the Union Depot Company. It is unnecessary to determine, we think, the effect of the decree of the court, for the rights of the parties may be decided upon another theory. Suffice it to say that generally the condemnor takes only an easement in land taken for railroad tracks without the consent of the owner. [Constitution of Missouri, Art. II, Sec. 21; Union Depot Co. v. Frederick, 117 Mo. 138, 21 S. W. 1118, 1130, 26 S. W. 350; Kellogg v. Malin, 50 Mo. 496.]

The Union Depot Company was incorporated in pursuance to Laws of 1871, page 59. Its articles of association provide: "That the objects for which such corporation is formed are the construction, establishment and maintenance of a Union Passenger Depot in

the City of Kansas, Jackson County, Missouri." The evidence shows that, upon the completion of the Union Depot in 1879, the building and land were used for such purposes until the completion of the new passenger station on November 1, 1914. In 1906, the Kansas City Terminal Railway was organized under the general railroad law and the Union Depot Act. The ten railroads operating the Union Depot, in 1909, because its location was subject to floods and for other reasons, executed an agreement with respect to the construction of a new Union Station at a different location, and transferred all their stock in the Union Depot Company to the Kansas City Terminal Railway Company, and in 1910 all real estate and property were transferred to it. It continued to operate the old Union Depot until the completion of the new Union Station and the taking effect of the new operating agreement on November 1, 1914. In 1915 the old Union Depot building was demolished and the stub-end tracks connected for the use of traffic.

It is evident, we think, that the land in litigation is being used for union passenger depot purposes. The purpose of the act, as to the establishment and maintenance of a union passenger depot, is comprehensive. The act authorizing the organization of such a corporation (Laws 1871, p. 59) defines the purpose, which is to facilitate the public convenience and safety in the transmission of goods and passengers in large cities from one railroad to another. In order to facilitate such purpose, a union passenger depot is impliedly authorized to acquire and maintain storage tracks upon which temporarily to store cars used or to be used for passenger purposes. The non-maintenance of such appurtenant tracks would jeopardize the convenience and safety of passengers. The functions of a depot comprise not only a building for the shelter of the passengers, and access of the trains to the station and appurtenant tracks for the placing of trains to receive and discharge passengers, but include tracks adequate in number leading to the tracks of the various railroads, equipped with signals for the safety of the trains and passengers. Such a use also includes tracks for ingress and egress to and from the station, and to and from car yards, engine yards, roundhouses and other appurtenant facilities conducive to the safety and convenience of the traveling public. Moreover, while the main purpose of a union depot is the convenience and safety of passengers, nevertheless railroads generally over the same tracks haul passenger and freight cars indiscriminately, resulting that to a union depot company, with tracks necessarily leading to the main tracks of railroads, is allocated the appurtenant power to provide trackage for freight trains, so as to eliminate an interference with the main purpose of the union passenger depot.

We find that the new union passenger station provided a complete system for the handling of passenger trains, and that comprised in that system and appurtenant to it was the land in litigation, on which tracks were provided, which were used, as necessity or convenience required, for the temporary storage of Pullman cars, for the passage of troop, immigrant and circus trains, for an auxiliary or alternative entrance, which seems to have been not infrequent, to the new union station, of trains of the Burlington, Wabash and Rock Island, thus preventing an interruption of passenger traffic and service, and for the daily passage of passenger engines of the Chicago & Alton Railroad to and from the station and roundhouse. At one period the tracks on the land were used by the Missouri Pacific for the passage of through trains to and from the new Union Station.

This issue, as well as other issues involved, has been of difficult solution. However, we are convinced and constrained, by a study of the record and evidence, to hold that the land in litigation is appurtenant to the purposes of the new union passenger station, and that it is now used for the purposes for which it was condemned, resulting that evidence fails to show an abandonment of the use. Consequently, on this phase of the case, as it appears that the use of the land for union passenger depot purposes has not been abandoned, neither plaintiff-appellant nor defendants-appellants has or have the right to possession. [Stevens v. St. Louis Terminal Ry. Co., 152 Mo. 212, 53 S. W. 1066; Hannibal & St. Joseph Railroad Co. v. Baker, 185 Mo. 312, 82 S. W. 85.]

V. There is another reason that prohibits a judgment in favor of defendants-appellants. They or their predecessors in interest organized the old Union Depot Company. Some thirty to forty years later, pursuant to an operating agreement between them, the railroads, operating the said Union Depot, transferred their interest in said Union Depot Company to the Kansas City Terminal Railway Company, and subsequently all real estate and other property, held and owned by the old Union Depot Company, were conveyed to it. These facts estop defendants-appellants from claiming, as against the said Terminal Company, any interest or title to the land in litigation.

The judgment is affirmed. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion of DAVIS, C., in Division Two, is hereby adopted as the opinion of Court en Banc. All of the judges concur.