STATE OF MISSOURI at the relation of the ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Relator, v. HOPKINS B. SHAIN, EWING C. BLAND and WILLIAM C. KEMP, Judges of the Kansas City Court of Appeals.—134 S. W. (2d) 89.

Division One, December 13, 1939.

*J. W. Jamison, M. J. Henderson, Thos. E. Deacy* and *W. M. Raines* for relator.

*Moss H. Silverforb* and *Chas. N. Sadler* for respondents.

BRADLEY, C.—This cause is in certiorari to quash the judgment and opinion of the Kansas City Court of Appeals in St. Louis-San Francisco Railway Company v. Silver King Oil & Gas Co., 127 S. W. (2d) 31, wherein the Court of Appeals reversed a judgment in favor of the plaintiff in that case. ■ We are concerned only with whether or not the opinion is in conflict with the last controlling decision of this court on the points ruled. [State ex rel. Mo. Mut. Assn. v. Allen et. al., 336 Mo. 352, 78 S. W. (2d) 862; State ex rel. Mills v. Allen et al., 344 Mo. 743, 128 S. W. (2d) 1040.] Also, in certiorari to quash the judgment and opinion of a Court of Appeals, the Supreme Court will not go beyond the opinion for the facts. [State ex rel. Silverforb v. Smith et al. (Mo.), 43 S. W. (2d) 1054, l. c. 1057 and cases there cited.] However, any document referred to in the opinion may be considered the same as if set out in full. [State ex rel. Mutual Life Ins. Co. v. Shain et al., 339 Mo. 621, 98 S. W. (2d) 690; State ex rel. Talbott v. Shain, 334 Mo. 617, 66 S. W. (2d) 826.]

From the opinion we ascertain that relator claimed an easement in a strip of land twelve and one-half feet in width off the west side of lot 209 in Garfield Park addition to Kansas City, and brought suit against the Silver King Oil & Gas Company seeking a decree directing that company to remove obstructions alleged to have been placed by it on the strip, and to enjoin further obstruction. Relator was successful in the trial of that case and the oil and gas company appealed. The Court of Appeals reversed the judgment as above stated.

The facts, as they appear in the opinion, follow: In 1889, J. H. L. Faber, owner of the lot, conveyed an easement in the strip to the Kansas City, Ft. Scott & Memphis Railroad Company "for the sole purpose of allowing the public, who have business to transact with said railroad company on its Garfield Park switch so called, now constructed on its right of way in the rear of said lots, access to and from the same." August 12, 1901, the grantee in the Faber deed, conveyed, without specific description, all of its property and rights to the Kansas City, Ft. Scott & Memphis Railway Company, and on September 19, 1928, the last named grantee conveyed, without specific description, all of its property and rights to relator. Conradine Otto, through mesne conveyances from Faber, obtained title to lot 209 in December, 1900, and in 1919, she executed an instrument by which she assigned to relator's immediate grantor the "same rights, privileges and authority given and granted" to the grantee in the Faber deed.

One Dietrich became the owner of the lot, and in 1930, he leased it to the Silver King Oil & Gas Company. In August, 1931, relator, by letter directed the oil and gas company to clear the strip of obstructions. In reply to this letter the oil and gas company said that it did not recognize that relator had any title rights in the lot, but that relator would be allowed "ingress and egress only on twelve and one-half feet of this ground," and that if relator desired or intended "to have any one load or unload anything, we shall confine them to the easement right above referred to and compel them to the use of the twelve and one half foot strip of property in question."

In April, 1934, Deitrich conveyed lot 209, and other lots, to the oil and gas company, "subject to the rights of the Kansas City, Ft. Scott & Memphis Railway Company to parts of said lots as shown by instruments recorded in Book B-2057 at page 59 in the office of the recorder of deeds of Jackson County, Missouri, . . . and except for and subject to the rights of the Kansas City, Ft. Scott & Memphis Railway Company as aforesaid, including the rights of the successor or successors of said railway company, if any." The deed recorded in Book B-2057, page 59, was the deed from Otto to the Kansas City, Ft. Scott & Memphis Railway Company in December, 1919.

The opinion of respondents makes reference to the pleadings in the cause before them, as follows: "The petition upon which the cause was tried alleged that plaintiff owned 'a certain spur track,'. . . . in its yards in Kansas City, Missouri; that it owned for the daily use of the public in going to and from said spur track, a strip of land twelve and one-half feet wide off the entire westerly side of lot 209, which strip had been conveyed to its predecessor in title for the use of the public in obtaining access to said spur and right of way, and for the purpose of providing such of the public as have business to transact with plaintiff on the spur track, a means of access to and from the spur for vehicular traffic; that defendant (the time was not stated) constructed and maintained on the strip a grease rack, a fence and a sign which obstructed and prevented the use of the strip as a means of access to and from the spur; that the obstruction on the strip harassed and annoyed persons in driving vehicles to and from the spur and caused plaintiff to sustain great financial loss.

"The answer tendered the general issue, denied plaintiff held any title, easement or right in the strip for the use of the public; denied the strip was necessary for the use of persons having business with plaintiff at any of the places mentioned in the petition, and further alleged that any easement plaintiff or its predecessor may have had in the strip had long since been abandoned."

The opinion sets out the evidence as follows: "Plaintiff's roadmaster and terminal engineer, A. J. Finn, testified that the spur track 'referred to in the deeds' was called Garfield Team Track Num-

ber 2; that he 'mapped' the territory between 1926 and 1928; that (we infer) in the latter part of 1930 or early part of 1931 the defendant constructed a grease rack 6 feet wide and 28 feet long in the middle of the strip, and constructed a sign 10 feet high and 16 feet long upon the fence along the westerly side of the strip; that the grease rack and sign were moved from the strip, evidently soon after this suit was brought; that about the time the grease rack and sign were moved from the strip, a fence was constructed across the northwest end of the strip, which prevented vehicular traffic on the strip. The witness further testified in effect that the obstruction on the strip inconvenienced the public in transacting business with plaintiff upon its several spur tracks in its yards to the north of lot 209.

"John Burch, plaintiff's superintendent of terminals, testified that at the time of the trial, December, 1935, there was a fence across the northwest end of the strip which prevented vehicles travelling from the strip to plaintiff's yards; that in 1922, 1923 and a part of 1924, the railroad 'placed cars on Garfield team track daily for unloading. They (the haulers) drove in off of Wyoming (street) and out onto Southwest Boulevard. . . . They went out through the lot there. I wouldn't be positive whether they stayed within the twelve and one-half foot strip or not. They went out through the lot next to the fence of the Milton Oil Company where the fence is now located. . . . I have seen a good many trucks drive out through that space. I couldn't say they were on the twelve and one-half foot strip.'

"Burch further testified that plaintiff or its predecessor, between 1925 and 1930, moved the Garfield track 10 or 12 feet to the north and built a track called the Savage track between the Garfield track and the northwest end of the strip; that the rails of the Savage track were elevated 'about a foot above the level of the ground there. . . . Q. So you couldn't drive a truck over that, could you, to get to the Garfield track after that (Savage track) was built in?· A. No, you couldn't drive across those tracks.'

"Plaintiff's witness, Harman, testified the strip 'was open' for several years prior to 1927, was called 'an alley;' that many vehicles travelled the alley in going to and from the two south tracks north of lot 209.

"The defendant's evidence was to the effect it went into possession of lot 209 in July, 1930; that the grease rack did not obstruct travel on the strip and that the grease rack and sign were moved soon after this suit was brought, and that there was no travel on the strip from July, 1930, to the time of the trial in 1935; that during that time haulers used another driveway in going to and from the plaintiff's yards. Three witnesses, for the defendant, testified that the fence across the northwest end of the strip was built in February, 1935. Two of said witnesses stated they built the fence. Photographs taken soon after this suit was brought appear to show there was no fence

across the strip. The evidence of both parties shows vehicles did not travel along the strip from some time in 1930 to the time of trial. So if the fence were not built until in February; 1935, the failure to use the strip as a roadway during that several years was not due to any act of the defendant except during the short period the grease rack occupied a part of the strip. We think the greater weight of the evidence shows the fence across the strip was built in 1935, and not at an earlier time."

After stating the evidence as appears, supra, the Court of Appeals said: "Whether or not the failure to use the strip during the time mentioned in and of itself constituted an abandonment of the easement, is a question we need not determine."

After stating that it was not necessary to rule the question last mentioned, the court disposed of the case as follows:

"The easement granted in the Faber deed and kept alive by the Otto deed was a limited one. The grant is plain and clear in its terms. Under it only the public 'who have' business to transact with the railroad company on its Garfield Park switch were allowed to travel along the strip. The evidence for plaintiff (relator here) shows the Garfield Park track was moved and the Savage track built prior to the time defendant took possession of lot 209; that the elevation of the latter track was such that a vehicle could not travel from the strip to the Garfield Park track. We conclude the construction and maintenance of the Savage track for a period of years prior to the time any obstructions were placed on the strip were acts 'of such an unequivocal nature as to indicate a clear intention to abandon' any right the plaintiff or its predecessor had in the strip. . . . The easement was granted for a particular purpose, namely, for use by those having business with the railroad on the Garfield track. Hence, construction and maintenance of the Savage track was 'incompatible with the existence of the right claimed.' "

Relator states the alleged conflict as follows: "The ruling of the Court of Appeals is contrary to and in conflict with the latest controlling decisions of this court in holding that the construction of a new spur track in approximately the same location. (It was 10 or 12 feet north) as the spur track mentioned in the written grant, under which relator acquired an easement was an act which constituted abandonment on the part of the relator to any claim to an easement over said strip of land."

Relator says that the ruling is in conflict with the rulings in St. Louis-San Francisco Ry. Co. v. Dillard, 328 Mo. 1154, 43 S. W. (2d) 1034; Powell et al. v. Bowen et al., 279 Mo. 280, 214 S. W. 142; Hickman v. Link et al., 116 Mo. 123, 22 S. W. 472; Coates & Hopkins Realty Co. v. Kansas City Terminal Ry. Co. et al., 328 Mo. 1118, 43 S. W. (2d) 817; Stevens v. St. Louis, M. B. T. Ry. Co., 152 Mo. 212, 53 S. W. 1066; Kansas City & N. C. Railroad Co. v. Baker,

183 Mo. 312, 82 S. W. 85; State ex rel. State Highway Comm. v. Griffith, 342 Mo. 229, 114 S. W. (2d) 976; St. Louis-San Francisco Railway Company v. King, 329 Mo. 1203, 50 S. W. (2d) 94; St. Joseph, St. Louis & Santa Fe Ry. Co. v. Smith et al., 170 Mo. 327, 70 S. W. 700.

The Dillard case, supra, was in ejectment, and the defense was adverse possession. The subject of abandonment was discussed, but there was no ruling, which conflicts with the ruling of relators in the present case. The Powell case, supra, was to quiet title, and the only point ruled that related to abandonment was (279 Mo. 280, 214 S. W. l. c. 144) that "the defense of abandonment, disassociated from other defenses, e. g., adverse possession, or a failure to pay taxes, has never been recognized as affecting title to real property at common law." The Hickman case was in ejectment and was first reported in 97 Mo. 482, 10 S. W. 600. On the second appeal the court quoted (116 Mo. l. c. 126, 22 S. W. 473), from the first opinion as follows: "It, therefore, follows that, if Goodwin failed or refused to pay the notes which he gave in part payment for his purchase of the two hundred and forty-five acres and abandoned the possession thereof, and Ann McCourtney or she and the heirs of Martin McCourtney, for a period of ten years had actual possession of a part of the four hundred and eighty arpents, and during that period claimed the whole, and exercised over the whole usual acts of ownership, then the defendant should prevail." Such was the only question of abandonment involved, and it is clear that there is no support in the Hickman case for the alleged conflict.

The Coates & Hopkins Realty Company case, supra, was to determine title to the land occupied by the old union station in Kansas City. The plaintiff was the grantee of the heirs of the owners before the land was ever used for railroad purposes. The land was condemned for depot purposes and it was so used for many years. A *new* union depot was later constructed, and the claim, in substance, was that the use for which the land was condemned had been abandoned, and that, because thereof, the land reverted to the original owners.

In the opinion the court said (328 Mo. 1118, 43 S. W. (2d) l. c. 824): "This issue (abandonment), as well as other issues involved, has been of difficult solution. However, we are convinced and constrained, by a study of the record and evidence, to hold that the land in litigation is appurtenant to the purposes of the new union passenger station, and that it is *now used* for the purposes for which it was condemned, resulting that evidence fails to show an abandonment of the use. Consequently, on this phase of the case, as it appears that the use of the land for union passenger depot purposes has not been abandoned" (Italics ours).

It will be noted that in the Coates & Hopkins Realty Company case, according to the finding, that there had never been any *cessation* of

the *use* for which the land was condemned, while in the present case, according to the facts stated in the opinion, there had been, over a period of years, a complete *cessation of the use* of the strip for the purpose for which the easement was granted. We find no support in the Coates & Hopkins Realty Company case for the alleged conflict.

St. Joseph, St. Louis & Santa Fe Ry. Co. v. Smith et al., supra, was in ejectment. It was ruled (170 Mo. l. c. 333, 70 S. W. 702), that a railroad company "is not cut off from its right to claim that such land is appropriated to a public use, because it had not previous to the controversy actually used it for a right of way, depot grounds, etc., for it was pointed out that, if the land was within the designation, the company was not obliged to actually occupy it until it became necessary or desirable for it to do so, and that any one who enters upon land so owned by a railroad company, and erects improvements thereon, does so at his peril, and is affected with notice of the rights of the railroad to such land, and that no possession can be adverse to the railroad or be made the basis of a title by limitation as against the railroad, no matter how long that possession may continue." The subject of abandonment was not discussed.

■ We deem it unnecessary to analyze other cases cited by relator. There is no support in any of them, or in any case we find from our own research, for the alleged conflict claimed by relator. As stated at the outset, we are concerned only with a question of conflict, and we might add that in such proceeding as here we do not attempt to determine whether the opinion of the Court of Appeals is right or wrong. In State ex rel. Vesper-Buick Automobile Co. v. Daues et al., 323 Mo. 388, 19 S. W. (2d) 700, l. c. 703, we said that "under the Constitution and laws of this State, each of the several Courts of Appeals is a court of last and final resort, when acting within its prescribed jurisdiction, and its rulings, decisions, and judgments, whether they be right or wrong, are final and conclusive, when sought to be reviewed in this court by certiorari, except only in those cases wherein it clearly appears that a Court of Appeals has announced some general principle of law contrary to the last previous announcement of this court upon the subject, or, on a given state of facts, such Court of Appeals has announced and applied a conclusion of law or equity contrary to a conclusion announced and applied by this court upon the same, or a similar, state of facts."

We find no conflict, and it, therefore, follows that the writ issued in this cause should be quashed, and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.